**AMERICAN BOOKSELLERS ASSOCIATION, INC., et al., Plaintiffs,**

v.

**William H. HUDNUT, III, Mayor of the City of Indianapolis, et al., Defendants.**

**No. IP 84–791C.**

United States District Court, S.D. Indiana, Indianapolis Division.

Nov. 19, 1984.

Richard Kammen, McClure McClure & Kammen, Robert G. Elrod, Elrod, Elrod & Mascher, Indianapolis, Ind., Michael A. Bamberger, P.C., Jeffrey A. Mitchell, Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, New York City, Richard W. Cardwell, Ober, Symmes, Cardwell, Voyles & Zahn, Indianapolis, Ind., Burton Joseph, Barsy & Joseph, Chicago, Ill., John H. Weston, Brown, Weston & Sarno, Beverly Hills, Cal., Franklin I. Miroff, Ancel, Miroff & Frank, Sheila Suess Kennedy, Mears, Crawford, Kennedy & Eichholtz, Indianapolis, Ind., for plaintiffs.

Charles S. Sims, Burt Neuborne, Harriet Pilpel, New York City, amicus curiae for plaintiff American Civil Liberties Union.

John Wood, Bamberger & Feibleman, Indianapolis, Ind., amicus curiae for plaintiff Indiana Civil Liberties Union.

Don H. Reuben, James A. Klenk, Reuben & Proctor, Chicago, Ill., amicus curiae for plaintiffs Indiana Library Ass'n, Indiana Library Trustee Ass'n.

John P. Ryan, Corp. Counsel, Mark Dall, Kathryn Watson, Asst. Corp. Counsels, City of Indianapolis, Legal Div., Indianapolis, Ind., for defendants.

Catharine A. MacKinnon, University of Minnesota Law School, Minneapolis, Minn., amicus curiae for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARKER, District Judge.

This matter comes before the Court on the June 22, 1984 motion of the plaintiffs for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the issues of their June 20, 1984 second amended complaint and defendants' June 21, 1984 answer thereto. The motion became fully briefed with the filing of the movants' reply on July 11, 1984. Additionally, two *amicus curiae* were permitted to file briefs in this action. On July 30, 1984, oral arguments were presented to the Court, at which time defendants by oral motion recast their opposing brief into a cross-motion for summary judgment, which motion the Court granted.

Based upon the undisputed facts, the parties' and amicus briefs and oral argument of counsel, the Court now submits its findings of fact and conclusions of law. In accordance therewith, plaintiffs' motion for summary judgment is GRANTED and defendants' cross-motion for summary judgment is DENIED, and the challenged Ordinance is declared to be unconstitutional.

### Findings of Fact

1. On April 23, 1984, and June 11, 1984, the Indianapolis-Marion County City-County Council (hereinafter "Council") passed General Ordinances No. 24, 1984 and 35,

1984, respectively, which amended the Code of Indianapolis and Marion County, Indiana, Chapter 16, "Human Relations and Equal Opportunity" (hereinafter "the Ordinance"). The original Ordinance was signed into law by Indianapolis Mayor William H. Hudnut, III, on May 1, 1984, and the amendments thereto on June 15, 1984.

2. The plaintiff, American Booksellers Association, Inc., is a trade association composed of booksellers located throughout the United States. The Association has approximately 5,200 members, consisting of private bookstores, department store bookstores, and chain bookstores, some of which are located in Indianapolis.

3. The plaintiff, Association for American Publishers Inc., is a trade association organized under the laws of the State of New York. It is the major national association of publishers of general books, textbooks and educational materials in the United States. Its members publish the vast majority of all general, educational, and religious books and materials produced in the United States, which are sold and distributed in book stores, department stores, drug stores, news-stands and other outlets throughout the United States, some of which are in Indianapolis. The Association has in excess of 300 members, virtually all of which publish materials sold in Indianapolis.

4. The plaintiff, Council for Periodical Distributors Associations, is a national trade association, having over 500 independent, local wholesale distributors of magazines, comic books, paperback books and newspapers, some of which are located or do business in Indianapolis.

5. The plaintiff, Freedom to Read Foundation, a non-profit organization supported by voluntary donations, was established in 1969 by the American Library Association to promote and defend First Amendment rights, to foster libraries as institutions wherein First Amendment freedoms are fulfilled, to support the right of libraries to include in their collections and make available any stock which they may legally acquire, and to seek legal precedents for the freedom to read on behalf of all citizens.

6. The plaintiff, International Periodical Distributors Association, Inc., is the trade association for the principal national periodical distributors engaged in the business of distributing or arranging for the distribution of paperback books and periodicals to wholesalers throughout the United States for ultimate distribution to retailers and the public.

7. The plaintiff, Koch News Company, a partnership operating under the partnership laws of the State of Indiana, is the largest wholesale distributor in Indianapolis of periodicals, hardback books, paperback books, Bibles, school books and children's books.

8. The plaintiff, National Association of College Stores, Inc., is a trade association of college stores located throughout the United States. The Association has approximately 2,500 members, some of which are in Indianapolis.

9. The plaintiff Omega Satellite Products Co., a partnership operating under the partnership laws of the State of Indiana, is a distributor in Indianapolis of television programming received from satellite transmissions.

10. The plaintiff, Video Shack, Inc., is an Indiana corporation which sells and rents motion pictures and other programming on video cassettes at three retail locations in Indianapolis.

11. The plaintiff, Kelly Bentley, is an adult female resident and citizen of Indianapolis, and a reader and viewer of First Amendment protected material.

12. The defendants are the individual City-County officials responsible for enforcement and/or implementation of the Ordinance.

13. Public hearings were held by the Administration Committee of the Council and by the Council in connection with the passage of the Ordinance at which testimony was given and exhibits were submitted.

14. The Council made the following findings of legislative fact, as set forth in the Ordinance as Section 16–1(a)(2):

"Sec. 16–1. Findings, policies and purposes.

(a) Findings. The City-County Council hereby makes the following findings:

\* \* \* \* \* \*

(2) Pornography is a discriminatory practice based on sex which denies women equal opportunities in society. Pornography is central in creating and maintaining sex as a basis for discrimination. Pornography is a systematic practice of exploitation and subordination based on sex which differentially harms women. The bigotry and contempt it promotes, with the acts of aggression it fosters, harm women's opportunities for equality of rights in employment, education, access to and use of public accommodations, and acquisition of real property; promote rape, battery, child abuse, kidnapping and prostitution and inhibit just enforcement of laws against such acts; and contribute significantly to restricting women in particular from full exercise of citizenship and participation in public life, including in neighborhoods."

15. The stated purpose of the Ordinance is set forth in Section 16–1(b)(8), which provides:

"(b) It is the purpose of this ordinance to carry out the following policies of the City of Indianapolis and Marion County:

\* \* \* \* \* \*

(8) To prevent and prohibit all discriminatory practices of sexual subordination or inequality through pornography."

16. "Pornography" is defined in the Ordinance as follows:

"(q) Pornography shall mean the graphic sexually explicit subordination of women, whether in pictures or in words, that also includes one or more of the following:

(1) Women are presented as sexual objects who enjoy pain or humiliation; or

(2) Women are presented as sexual objects who experience sexual pleasure in being raped; or

(3) Women are presented as sexual objects tied up or cut up or mutilated or bruised or physically hurt, or as dismembered or truncated or fragmented or severed into body parts; or

(4) Women are presented being penetrated by objects or animals; or

(5) Women are presented in scenarios of degradation, injury, abusement, torture, shown as filthy or inferior, bleeding, bruised, or hurt in a context that makes these conditions sexual; and

(6) Women are presented as sexual objects for domination, conquest, violation, exploitation, possession, or use, or through postures or positions of servility or submission or display.

The use of men, children, or transsexuals in the place of women in paragraphs (1) through (6) above shall also constitute pornography under this section."

Section 16–3(q).

17. Section 16–15 of the Ordinance makes the following discriminatory practices unlawful:

"(4) Trafficking in pornography: The production, sale, exhibition, or distribution of pornography.

A. City, state, and federally funded public libraries or private and public university and college libraries in which pornography is available for study, including on open shelves, shall not be construed to be trafficking in pornography, but special display presentations of pornography in said places is sex discrimination.

(B) The formation of private clubs or associations for purposes of trafficking in pornography is illegal and shall be considered a conspiracy to violate the civil rights of women.

(C) This paragraph (4) shall not be construed to make isolated passages or isolated parts actionable.

(5) Coercion into a pornographic performance: coercing, intimidating or

fraudulently inducing any person, including a man, transsexual, into performing for pornography, which injury may date from any appearance or sale of any product(s) of such performance. (A) Proof of the following facts or conditions shall not constitute a defense:

I. That the person is a woman; or

II. That the person is or has been a prostitute; or

III. That the person has attained the age of majority; or

IV. That the person is connected by blood or marriage to anyone involved in or related to the making of the pornography; or

V. That the person has previously had, or been thought to have had, sexual relations with anyone, including anyone involved in or related to the making of the pornography; or

VI. That the person has previously posed for sexually explicit pictures for or with anyone, including anyone involved in or related to the making of the pornography at issues; or

VII. That anyone else, including a spouse or other relative, has given permission on the person's behalf; or

VIII. That the person actually consented to a use of the performance that is changed into pornography; or

IX. That the person knew that the purpose of the acts or events in question was to make pornography; or

X. That the person demonstrated no resistance or appeared to cooperate actively in the photographic sessions or in the sexual events that produced the pornography; or

XI. That the person signed a contract, or made statements affirming a willingness to cooperate in the production of pornography; or

XII. That no physical force, threats, or weapons were used in the making of the pornography; or

XIII. That the person was paid or otherwise compensated."

(6) Forcing pornography on a person: The forcing of pornography on any woman, man, child, or transsexual in any place of employment, in education, in a home, or in any public place.

(7) Assault or physical attack due to pornography: The assault, physical attack, or injury of any woman, man, child, or transsexual in a way that is directly caused by specific pornography."

Section 16–3(g)(4)–(7).

22. Under the Ordinance, Section 16–3(g)(8), it is no defense to the discriminatory practices quoted in Finding 17 above that the respondent did not know or intend that the materials were pornography or sex discrimination, except where money damages are sought against respondent:

"(8) Defenses. Where the materials which are the subject matter of a complaint under paragraphs (4), (5), (6), or (7) of this subsection (g) are pornography, it shall not be a defense that the respondent did not know or intend that the materials were pornography or sex discrimination; provided, however, that in the cases under paragraph (g)(4) of Section 16–3, no damages or compensation for losses shall be recoverable unless the complainant proves that the respondent knew or had reason to know that the materials were pornography. Provided, further, that it shall be a defense to a complaint under paragraph (g)(4) of Section 16–3 that the materials complained of are those covered only by paragraph (q)(6) of Section 16–3."

19. Section 16–17 of the Ordinance sets forth the grounds for filing a complaint, who may file, and the persons against whom a complaint may be filed:

"(a) A complaint charging that any person has engaged in or is engaging in a discriminatory practice prohibited by sections 16–14 and/or 16–15 may be filed with the office by any person claiming to be aggrieved by the practice, or by one or more members of the board or employees of the office who have reasonable cause to believe that a violation of

sections 16–14 and 16–15 has occurred, in any of the following circumstances:

\* \* \* \* \* \*

(6) In the cases of trafficing in pornography, coercion into pornographic performances, and assault or physical attack due to pornography (as provided in Section 16–3(g)(7)) against the perpetrator(s), maker(s), seller(s), exhibitor(s), or distributor(s).

(7) In the case of forcing pornography on a person, against the perpetrator(s) and/or institution.

(b) In the case of trafficking in pornography, any woman may file a complaint as a woman acting against the subordination of women and any man, child, or transsexual may file a complaint but must prove injury in the same way that a woman is injured in order to obtain relief under this chapter.

(c) In the case of assault or physical attack due to pornograrphy, compensation for losses or an award for damages shall not be assessed against (1) maker(s), for pornography made, (2) distributor(s), for pornography distributed, (3) seller(s), for pornography sold, or (4) exhibitor(s) for pornography exhibited, prior to the effective date of this act."

20. Once a complaint alleging a discriminatory practice has been filed, the Ordinance provides for an investigation of the alleged unlawful practice, and for an informal conference in an effort to eliminate such practice if there is reasonable cause to believe that any violation has occurred:

"Sec. 16–24. Investigation and conciliation.

(1) Investigation. Within ten (10) working days after the receipt of a complaint filed pursuant to this chapter, the chief officer shall initiate an investigation of the alleged discriminatory practice charged in the complaint. All such investigations shall be made by the office at the direction of the chief officer and may include informal conferences or discussions with any party to the complaint for the purpose of obtaining additional information or attempting to resolve or eliminate the alleged discriminatory practice by conciliation or persuasion. The office shall have the authority to initiate discovery, including but not limited to interrogatories, request for production of documents and subpoenas, on approval of the chief officer at any time within ten (10) working days after filing of a complaint. Any request by the office to compel discovery may be by appropriate petition to the Marion County circuit or superior courts.

(2) Report of investigation; determination by panel. Unless the complaint has been satisfactorily resolved prior thereto, the chief officer shall, within thirty (30) working days after the date of filing of a complaint pursuant to section 16–17, report the results of the investigation made pursuant to subsection (1) to a panel of three (3) members of the board designated by the chairperson or vice-chairperson or pursuant to the rules of the board, which panel shall not include any member of the board who initiated the complaint, who might have participated in the investigation of the complaint, or who is a member of the complaint adjudication committee. The chief officer shall make a recommendation as to whether there is reasonable cause to believe that the respondent has violated sections 16–14 and/or 16–15. The chairperson, vice-chairperson or such other member of the panel so designated, may, for good cause shown, extend the time for making such report. Such extension thereof shall be evidenced in writing, and the office shall serve a copy of the extension on both the complainant and the respondent. The panel shall then determine by majority vote whether reasonable cause exists to believe that any respondent has violated sections 16–14 and/or 16–15. In making such a determination, the panel shall consider only the complaint, the response, if any, and the chief officer's report; provided, however, the panel may request the chief officer to make a supplemental investigation and report with respect to

any matter which it deems material to such determination.

(3) Action when violation found. If the panel, pursuant to subsection (2) determines that reasonable cause exists to believe that any respondent has violated sections 16–14 and/or 16–15, it may direct the chief office to endeavor to eliminate the alleged discriminatory practice through a conciliation conference. At least one panel member shall be present at any conciliation conference at which both the complainant and respondent are present or represented. If the complaint is satisfactorily resolved through conciliation, the terms of any agreement reached or undertaking given by any party shall be reduced to writing and signed by the complainant, respondent and the chief officer. Any disagreement between the respondent and the chief office in regard to the terms or conditions of a proposed conciliation agreement may be referred to the panel which considered the complaint, and the decision of the panel with respect to such terms or conditions shall be final for purposes of conciliation proceedings under this subsection, but shall not be binding upon the respondent without his written consent thereto. No action taken or statement made in connection with any proceedings under this subsection, and no written conciliation agreement or any of the terms thereof, shall be made public by the board or any member thereof, or any agent or employee of the officer, without the written consent of the parties, nor shall any such action, statement or agreement be admissible in evidence in any subsequent proceedings; provided, however, the board or officer may institute legal proceedings under this chapter for enforcement of any written agreement or undertaking executed in accordance with this subsection."

Section 16–24.

21. If the dispute has not been satisfactorily resolved through the informal proceedings outlined in Finding 20, above, the Complaint Adjudication Committee may hold a public hearing, which is governed by the procedure set forth in Section 16–26, which provides:

"Sec. 16–26. Hearings, findings and recommendations when conciliation not effected.

(a) Hearing to be held; notice. If a complaint filed pursuant to this article has not been satisfactorily resolved within a reasonable time through informal proceedings pursuant to section 16–24, or if the panel investigating the complaint determines that a conciliation conference is inappropriate under the circumstances surrounding the complaint, the complaint adjudication committee may hold a public hearing thereon upon not less than ten (10) working days' written notice to the complainant or other aggrieved person, and to the respondent. If the respondent has not previously filed a written response to the complaint, he may file such response and serve a copy thereof upon the complainant and the office not later than five (5) working days prior to the date of the hearing.

(b) Powers; rights of parties at hearing. In connection with a hearing held pursuant to subsection (1), the complaint adjudication committee shall have power upon any matter pertinent to the complaint or response thereto, to subpoena witnesses and compel their attendance; to require the production of pertinent books, papers or other documents; and to administer oaths. The complainant shall have the right to be represented by the chief officer or any attorney of his/her choice. The respondent shall have the right to be represented by any attorney or any other person of his/her choice. The complainant and respondent shall have the right to appear in person at the hearing, to be represented by an attorney or any other person, to subpoena and compel the attendance of witnesses, and to examine and cross-examine witnesses. The complaint adjudication committee may adopt appropriate rules for the issuance of subpoenas and the conduct of hearings under this section. The complaint adjudication committee

and the board shall have the power to enforce discovery and subpoenas by appropriate petition to the Marion County Circuit or superior courts.

(c) Statement of evidence; exceptions; arguments. Within thirty (30) working days from the close of the hearing, the complaint adjudication committee shall prepare a report containing written recommended findings of fact and conclusions and file such report with the office. A copy of the report shall be furnished to the complainant and respondent, each of whom shall have an opportunity to submit written exceptions within such time as the rules of the complaint adjudication committee shall permit. The complaint adjudication committee may, in its discretion, upon notice to each interested party hear further evidence or argument upon the issues presented by the report and exceptions, if any.

(d) Findings of fact; sustaining or dismissing complaint. If, upon the preponderance of the evidence, the committee shall be of the opinion that any respondent has engaged or is engaging in a discriminatory practice in violation of the chapter, it shall state its findings of fact and conclusions and serve a copy thereof upon the complainant and the respondent. In addition, the committee may cause to be served on the respondent an order requiring the respondent to cease and desist from the unlawful discriminatory practice and requiring such person to take further affirmative action as will effectuate the purposes of this chapter, including but not limited to the power to restore complainant's losses incurred as a result of discriminatory treatment, as the committee may deem necessary to assure justice; to require the posting of notice setting forth the public policy of Marion County concerning equal opportunity and respondent's compliance with said policy in places of public accommodations; to require proof of compliance to be filed by respondent at periodic intervals; to require a person who has been found to be in violation of this ordinance, and who is licensed by a city

or county agency authorized to grant a license, to show cause to the licensing agency why his license should not be revoked or suspended. If, upon the preponderance of the evidence, the committee shall be of the opinion that any respondent has not engaged in a discriminatory practice in violation of this chapter it shall state its findings of fact and conclusions and serve a copy thereof upon the complainant and the respondent, and dismiss the complaint. Findings and conclusions made by the committee shall be based solely upon the record of the evidence presented at the hearing.

(e) Appeal to the board. Within thirty (30) working days after the issuance of findings and conclusions by the committee, either the complainant or the respondent may file a written appeal of the decision of the committee to the board; however, in the event that the committee requires a respondent to correct or eliminate a discriminatory practice within a time period less than thirty (30) working days, then that respondent must file his/her appeal within that time period. After considering the record of the evidence presented at the hearing and the findings and conclusions of the committee, the board may affirm the decision of the committee and adopt the findings and conclusions of the committee, or it may affirm the decision of the committee and make supplemental findings and conclusions of its own, or it may reverse the decision of the committee and make findings of fact and conclusions to support its decision. The board may also adopt, modify or reverse any relief ordered by the committee. The board must take any of the above actions within thirty (30) working days after the appeal is filed.

(f) Members of board who are ineligible to participate. No members of the board who initiated a complaint under this chapter or who participated in the investigation thereof shall participate in any hearing or determination under this section as a member of either a hearing

panel, the complaint adjudication committee or of the board.

(g) Appliciability of state law; judicial review. Except as otherwise specifically provided in this section or in rules adopted by the board of the complaint adjudication committee under this chapter, the applicable provisions of the Administrative Adjudication Act, IC 4-22-1, shall govern the conduct of hearings and determinations under this section, and findings of the board hereunder shall be subject to judicial review as provided in that act."

22. Relevant provisions of the Administrative Adjudication Act provide that "any party or person aggrieved by an order or determination made by any such agency shall be entitled to a judicial review thereof ...." I.C. 4-22-1-14(a). Review may be obtained by filing a verified petition in the county in which the aggrieved person resides, or in any county in which the order is to be enforced, within fifteen (15) days after the agency's determination. I.C. 4-22-1-14(a) and (b).

23. If, after a finding that the respondent has engaged in a discriminatory practice, the respondent has failed to correct or eliminate the discriminatory practice as prescribed by the board, the board may seek judicial enforcement of its decision by filing a complaint requesting temporary or permanent injunctive relief in its own name in the Marion County circuit or superior courts:

"Sec. 16-27. Court enforcement.

(a) Institution of action. In any case where the board or the committee has found that a respondent has engaged in or is engaging in a discriminatory practice in violation of sections 16-14 and/or 16-15, and such respondent has failed to correct or eliminate such discriminatory practice within the time limit prescribed by the board or the committee and the time limit for appeal to the board has elapsed, the board may file in its own name in the Marion County circuit or superior courts a complaint against the respondent for the enforcement of section 16-26. Such complaint may request such temporary or permanent injunctive relief as may be appropriate and such additional affirmative relief or orders as will effectuate the purposes of this chapter and as may be equitable, within the powers and jurisdiction of the court."

24. An aggrieved party, after filing a complaint may seek equitable relief through the courts:

"(c) Temporary judicial relief upon filing of complaint. Upon the filing of a complaint pursuant to section 16-17 by a person claiming to be aggrieved, the chief officer, in the name of the board and in accordance with such procedures as the board shall establish by rule, may seek temporary orders for injunctions in the Marion County circuit or superior courts to prevent irreparable harm to the complainant, pending resolution of the complaint by the office, complaint adjudication committee and the board."

Section 16-27(c).

25. Section 16-27(e) of the Ordinance provides that in complaints involving discrimination based on pornography, judicial review shall be de novo:

"(e) Trial de novo upon finding of sex discrimination related to pornography. In complaints involving discrimination through pornography, judicial review shall be de novo. Notwithstanding any other provision to the contrary, whenever the board or committee has found that a respondent has engaged in or is engaging in one of the discriminatory practices set forth in paragraph (g)(4) of Section 16-3 or as against a seller, exhibitor or distributor under paragraph (g)(7) of Section 16-3, the board shall, within ten (10) days after making such finding, file in its own name in the Marion County circuit or superior court an action for declaratory and/or injunctive relief. The board shall have the burden of proving that the actions of the respondent were in violation of this chapter.

Provided, however, that ... in any complaint under paragraph (g)(4) of Section 16-3 or against a seller, exhibitor or dis-

tributor under paragraph (g)(7) of Section 16–3 no temporary or permanent injunction shall issue prior to a final judicial determination that said activities of respondent do constitute a discriminatory practice under this chapter.

Provided further, that no temporary or permanent injunction under paragraph (g)(4) of Section 16–3 or against a seller, exhibitor or distributor under paragraph (g)(7) of Section 16–3 shall extend beyond such material(s) that, having been described with reasonable specificity by the injunction, have been determined to be validly proscribed under the ordinance."

26. Any conclusions of law stated below, to the extent that it constitutes a finding of fact, is herein incorporated by reference as an additional finding of fact by the Court.

### Conclusions of Law

1. This Court has jurisdiction of this cause pursuant to 28 U.S.C. §§ 1331, 1343(3), and 1343(4), 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201 and 2202, and the Court need not abstain from jurisdiction because the subject Ordinance is not susceptible to limiting constructions.

2. Because plaintiffs' contentions are rooted in the First Amendment they have standing to challenge the constitutionality of the Ordinance.

3. This case is sufficiently ripe for adjudication at this time, in that there exists a case or controversy within the meaning of Article III of the United States Constitution and the case law interpreting the same.

4. The Ordinance restricts pornography, and pornography as defined in the Ordinance is speech, not conduct.

5. The First Amendment protections extend to regulation of words and pictures, to the extent that they express ideas, and, therefore, constitute "speech," as that term is used in the First Amendment to the United States Constitution.

6. Only speech which does not receive First Amendment protection, may be subject to government regulation, and the controls imposed by the Ordinance do not fall within one of those established categories of speech which may be limited by legislative action, such as "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words," *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed.2d 1031 (1942), or child pornography. *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).

7. The Ordinance's proscription of "pornography" most clearly resembles proscriptions of "obscenity," which are subject to regulation by government, but it fails to meet the legal definition of obscenity and is, therefore, a restriction on speech that has traditionally been deemed protected by the First Amendment.

8. Since the Ordinance sweeps beyond unprotected obscenity, the expressed purpose of the governmental regulation of pornography is the suppression of protected speech.

9. The proscriptions against pornography as defined in the Ordinance survive constitutional scrutiny only if the State's interest in prohibiting sex discrimination is so compelling as to outweigh the constitutionally protected interest of free speech, and the Court concludes as a matter of law that it does not outweigh the interest of free speech.

10. Assuming *arguendo* that the state's interest in prohibiting sex discrimination does outweigh the First Amendment interest of free speech, the Ordinance is nonetheless unconstitutional for the following reasons:

(a) it is unconstitutionally vague in that it fails to give fair notice to a person of average intelligence regarding what material is intended to be proscribed; and

(b) as applied to the type of activity described in Section 16–3(g)(5) and (6), it constitutes an unconstitutional prior restraint on speech because it fails to provide procedural safeguards to reduce the

danger of suppressing speech otherwise protected by the First Amendment.

11. The law is with plaintiffs on all claims asserted in Count I. The Court need not reach the assertions in Counts II, III, IV, and V. However, if defendants had prevailed on Count I, the law is with plaintiffs on all claims asserted in Counts II, III, and V. As to Count IV, the law is with plaintiffs as applied to Section 16–3(g)(5) and (6) and with the defendants as applied to Section 16–3(g)(4) and (7).

12. Plaintiffs are entitled to permanent injunctive and declaratory relief, costs of litigation, and reasonable attorneys' fees.

13. Any finding of fact stated above, to the extent that it constitutes a conclusion of law, is herein incorporated by reference as an additional conclusion of law by the Court.

## MEMORANDUM

This case comes to the Court amidst heated public and private debate over the problems of pornography and sex discrimination in American society. In apparent response to the perceived urgency and seriousness of these issues, the Indianapolis City-County Council debated and enacted an ordinance with subsequent amendments which sought to deal with both of these conditions by limiting the availability in Indianapolis of materials which depict the sexually explicit subordination of women. The Council defined pornography as the graphic depiction of the sexually explicit subordination of women and then declared pornography a discriminatory practice. By way of outlawing this practice, it then forbade most of the specific acts necessary to produce, sell, or distribute such material.

It is difficult to quarrel either with the Council's underlying concern (that pornography and sex discrimination are harmful, offensive, and inimical to and inconsistent with enlightened approaches to equality) or with its premise that some legislative controls are in order. But beyond that, it is in fact outside the rightful purview of this Court to enter the public debate over whether and to what extent these conditions constitute a real social harm. It is also beyond the purview of the Court to substitute its judgment for that of the legislative body, either in defining the acceptable community standards in these areas or in imposing appropriate sanctions for behavior which violate those standards.

Thus, the Court's duty in this circumstance is a narrow one. That duty is to assess the constitutionality of the legislative enactment: to determine whether the Ordinance, however well-motivated or otherwise meritorious it may be, unconstitutionally diminishes, violates, or otherwise derrogates our fundamental freedoms as a people.

This litigation, therefore, requires the Court to weigh and resolve the conflict between the First Amendment guarantees of free speech, on the one hand, and the Fourteenth Amendment right to be free from sex-based discrimination, on the other hand. In addition, the Court must determine whether the Indianapolis enactment meets the due process requirements of the Fifth and Fourteenth Amendments.

The plaintiffs in this lawsuit request the Court "to preliminarily and permanently enjoin enforcement of, and to declare facially unconstitutional, void and of no effect, City-County General Ordinances No. 24 and 35, 1984 (together hereinafter referred to as the "Ordinance"), on the grounds that it is unconstitutional under the United States Constitution. The Ordinance was passed by the City-[County] Council, City of Indianapolis on April 23, 1984, and amended on June 11, 1984, and was signed by the Mayor of Indianapolis on May 1, 1984, and the amendments, on June 15, 1984.

Plaintiffs have cited numerous reasons to support their claim for relief. They first contend that the Ordinance severely restricts the availability, display and distribution of constitutionally protected, non-obscene materials, in violation of the First and Fourteenth Amendments. More specifically, they claim that the regulatory restraints of the Ordinances are not limited

merely to unprotected speech, such as obscenity. As a result, plaintiffs contend that they will be forced under the Ordinance to remove from availability in Indianapolis materials which are in fact protected by the First Amendment.

Plaintiffs also contend that in seeking to ban speech directed to the general public because it is highly offensive to many, the Ordinances violate established Supreme Court precedents which preclude the banning of speech simply because its contents may be socially or politically offensive to the majority.

The third contention of plaintiffs is that the Ordinance fails to provide fair notice to the residents of Indianapolis, and to those doing business there, as to what is covered or exempted. Because of this, the Ordinance is said to be unconstitutionally vague, in violation of the Fifth and Fourteenth Amendments to the United States Constitution. It is also alleged that the encroachment of the Ordinance into areas of protected expression has an unconstitutionally "chilling effect" on the exercise by plaintiffs of their rights to free speech under the First Amendment.

Plaintiffs furthermore charge that the Ordinance, by providing for "cease and desist" orders to enforce its proscriptions, constitutes a prior restraint which impermissibly allows a governmental Board to act as censor in determining what is and is not protected material under the First Amendment, and to control what materials may be written, distributed, sold, viewed or read in Indianapolis.

Finally, plaintiffs contend that the Ordinance interferes with the free flow of constitutionally protected books, periodicals, motion pictures, and television programs across state lines, in violation of the Commerce Clause of the United States Constitution, Article I, Section 8, and the laws thereunder which Congress has promulgated.

The defendants admit in their answer that the scope of the Ordinance goes beyond regulating obscene materials. However, they assert, such action does not violate the Constitution. Defendants deny every other allegation that the plaintiffs' rights as guaranteed by the United States Constitution are violated by this Ordinance.

## I.

### JURISDICTION: STANDING and RIPENESS

Before turning to a discussion of the constitutionality of the Ordinance, it is first necessary to decide whether the plaintiffs have standing to sue, and, if so, whether the case itself is ripe for adjudication.

As mentioned above, the plaintiffs complain that the Ordinance fails to define adequately the type of material intended to be regulated, that it permits unconstitutional prior restraints on speech, and that it is vague and overbroad, all in violation of the First Amendment.

■ Because the plaintiffs' "claims are rooted in the First Amendment, they are entitled to rely on the impact of the [Ordinance] on the expressive activities of others as well as their own." *Shad v. Borough of Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). When there are claims based on vagueness and overbreadth, case law "firmly establishes" that plaintiffs do in fact have standing to challenge the legislation. *See Grayned v. City of Rockford*, 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972); *See also, Shad, supra*, 452 U.S. at 66, 101 S.Ct. at 2181; *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). In addition, the complaint makes it clear that plaintiffs' interests are directly affected by the challenged Ordinance, and the Court does here so find. Based on these principles and findings the Court determines that the plaintiffs have standing to challenge the constitutionality of the Ordinance, both in their own individual capacities, and on behalf of others not presently before the Court but who may be similarly situated.

■ Besides challenging standing, the defendants also contest the propriety of

adjudicating these issues at this time, claiming no substantial controversy exists between the parties. Defendants correctly point out that "[t]he basic inquiry is whether the 'conflicting contentions of the parties ... present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.'" *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (quoting *Railway Mail Association v. Corsi,* 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945)) (other citations omitted). However, to establish a "case or controversy" under Article III of the Constitution, plaintiffs need not necessarily be the subjects of an administrative or judicial proceeding at the time the lawsuit is initiated. *Babbitt, supra,* 442 U.S. 297–99, 99 S.Ct. at 2308–09; *Entertainment Concepts, Inc., III v. Maciejewski,* 631 F.2d 497, 500 (7th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981). *See also, Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973); *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).

Accordingly, the Court finds that this action presents a justiciable case or controversy. Plaintiffs have alleged that the material they sell, distribute, and exhibit falls within the Ordinance, as best they can determine. The fact that the City-County Council amended the initially-passed Ordinance during the pendency of this lawsuit, also "indicates more than a broad policy that it will enforce this law generally." *Maciejewski, supra,* 631 F.2d at 500. Defendants, in fact, have given no indication that they will not enforce the Ordinance if this Court's stay is lifted and the new law is allowed to go into effect. "Under such circumstances, this Court does not feel it 'necessary that [plaintiffs] first expose [themselves] to actual ... prosecution to be entitled to challenge a statute [which they claim] deters the exercise of [their] constitutional rights.'" *NATCO Theatres v. Ratner,* 463 F.Supp. 1124, 1127 (S.D.N.Y. 1979), quoting *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974). *See also Craig v. Boren,* 429 U.S. 190, 194, 97 S.Ct. 451, 455, 50 L.Ed.2d 397 (1976).

## II.

## FIRST AMENDMENT REQUIREMENTS

This Ordinance cannot be analyzed adequately without first recognizing this: the drafters of the Ordinance have used what appears to be a legal term of art, "pornography," but have in fact given the term a specialized meaning which differs from the meanings ordinarily assigned to that word in both legal and common parlance. In Section 16–3(v) (page 6), the Ordinance states:

"Pornography shall mean the sexually explicit subordination of women, graphically depicted, whether in pictures or in words, that includes one or more of the following: ..."

There follows at that point a listing of five specific presentations of women in various settings which serve as examples of "pornography" and as such further define and describe that term under the Ordinance.

As is generally recognized, the word "pornography" is usually associated, and sometimes synonomous, with the word, "obscenity." "Obscenity" not only has its own separate and specialized meaning in the law, but in laymen's use also, and it is a much broader meaning than the definition given the word "pornography" in the Ordinance which is at issue in this action. There is thus a considerable risk of confusion in analyzing this ordinance unless care and precision are used in that process.

The Constitutional analysis of this Ordinance requires a determination of several underlying issues: first, the Court must determine whether the Ordinance imposes restraints on speech or behavior (content versus conduct); if the Ordinance is found to regulate speech, the Court must next determine whether the subject speech is protected or not protected under the First Amendment; if the speech which is regulated by this Ordinance is protected speech

under the Constitution, the Court must then decide whether the regulation is constitutionally permissible as being based on a compelling state interest justifying the removal of such speech from First Amendment protections.

A. *Do the Ordinances regulate speech or behavior (content or conduct)?*

■ It appears to be central to the defense of the Ordinance by defendants that the Court accept their premise that the City-County Council has not attempted to regulate speech, let alone protected speech. Defendants repeat throughout their briefs the incantation that their Ordinance regulates conduct, not speech. They contend (one senses with a certain sleight of hand) that the production, dissemination, and use of sexually explicit words and pictures *is* the actual subordination of women and not an expression of ideas deserving of First Amendment protection. (Defendants' Memorandum In Opposition To Plaintiffs' Motion For Summary Judgment, pp. 17–21).

Defendants claim support for their theory by analogy, arguing that it is an accepted and established legal distinction that has allowed other courts to find that advocacy of a racially "separate but equal" doctrine in a civil rights context is protected speech under the First Amendment though "segregation" is not constitutionally protected behavior. Accordingly, defendants characterize their Ordinance here as a civil rights measure, through which they seek to prevent the distribution, sale, and exhibition of "pornography," as defined in the Ordinance, in order to regulate and control the underlying unacceptable conduct.

The content-versus-conduct approach espoused by defendants is not persuasive, however, and is contrary to accepted First Amendment principles. Accepting as true the City-County Council's finding that pornography conditions society to subordinate women, the means by which the Ordinance attempts to combat this sex discrimination is nonetheless through the regulation of speech.

For instance, the definition of pornography, the control of which is the whole thrust of the Ordinance, states that it is "the sexually explicit subordination of women, graphically *depicted*, whether in *pictures* or in *words*, that includes one or more of the following:" (emphasis supplied) and the following five descriptive subparagraphs begin with the words, "Women are *presented* ..." (emphasis supplied).

The unlawful acts and discriminatory practices under the Ordinance are set out in Section 16–3(g):

"(4) Trafficking in pornography: the production, sale, exhibition, or distribution of pornography. [Subparagraphs omitted here]

(5) Coercion into pornographic performance: coercing, intimidating or fraudulently inducing any person ... into performing for pornography .... [Subparagraphs omitted here]

(6) Forcing pornography on a person: ....

(7) Assault or physical attack due to pornography: the assault, physical attack, or injury of any woman, man, child or transsexual in a way that is directly caused by specific pornography ...."

Section (7), *supra*, goes on to provide a cause of action in damages against the perpetrators, makers, distributors, sellers and exhibitors of pornography and injunctive relief against the further exhibition, distribution or sale of pornography.

In summary, therefore, the Ordinance establishes through the legislative findings that pornography causes a tendency to commit these various harmful acts, and outlaws the pornography (that is, the "depictions"), the activities involved in the production of pornography, and the behavior caused by or resulting from pornography.

Thus, though the purpose of the Ordinance is cast in civil rights terminology—"to prevent and prohibit all discriminatory practices of sexual subordination or inequality through pornography" (Section 16–1(b)(8))—it is clearly aimed at controlling the content of the speech and ideas

which the City-County Council has found harmful and offensive. Those words and pictures which depict women in sexually subordinate roles are banned by the Ordinance. Despite defendants' attempt to redefine offensive speech as harmful action, the clear wording of the Ordinance discloses that they seek to control speech, and those restrictions must be analyzed in light of applicable constitutional requirements and standards.

**B.** *Is the speech regulated by the Ordinance protected or unprotected speech under the First Amendment?*

The First Amendment provides that government shall make no law abridging the freedom of speech. However, "the First and Fourteenth Amendments have never been thought to give absolute protection to every individual to speak whenever or wherever he pleases or to use any form of address in any circumstances that he chooses." *Cohen v. California*, 403 U.S. 15, 19, 91 S.Ct. 1780, 1785, 29 L.Ed.2d 284 (1971). Courts have recognized only a "relatively few categories of instances," *id.* at 19–20, 91 S.Ct. at 1785, where the government may regulate certain forms of individual expression. The traditional categories of speech subject to permissible government regulation include "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). In addition, the Supreme Court has recently upheld legislation prohibiting the dissemination of material depicting children engaged in sexual conduct. *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).

Having found that the Ordinance at issue here seeks to regulate speech (and not conduct), the next question before the Court is whether the Ordinance, which seeks to restrict the distribution, sale, and exhibition of "pornography" as a form of sex discrimination against women, falls within one of the established categories of speech subject to permissible government regulation, that is, speech deemed to be unprotected by the First Amendment.

It is clear that this case does not present issues relating to profanity, libel, or "fighting words." [1] In searching for an analytical "peg," the plaintiffs argue that the Ordinance most closely resembles obscenity, and is, therefore, subject to the requirements set forth in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). (Plaintiffs' Memorandum Of Law In Support Of Moving Plaintiffs' Motion Pursuant to Federal Rules of Civil Procedure 56 for Summary Judgment, pp. 18–23). But the defendants admit that the scope of the Ordinance is not limited to the regulation of legally obscene material as defined in *Miller*. (*See*, Answer of Defendants William H. Hudnut, III, et al., ¶ 9). In fact, defendants concede that the "pornography" they seek to control goes beyond obscenity, as defined by the Supreme Court and excepted from First Amendment protections. Accordingly, the parties agree that the materials encompassed in the restrictions set out in the Ordinance include to some extent what have traditionally been protected materials.

The test under *Miller* for determining whether material is legal obscenity is:

**1.** Defendants attempt to utilize the language "[words] by their very utterance inflict injury or tend to incite an immediate breach of the peace," *Chaplinsky*, 315 U.S. at 572, 62 S.Ct. at 769, as legal justification for upholding the Ordinance as unprotected speech. Their argument is that pornography "is nothing more than the infliction of injury on women," and is, therefore, unprotected under the First Amendment. (Defendants' Memorandum In Opposition To Plaintiffs' Motion For Summary Judgment, p. 22.) In coming to this view, however, defendants have read this passage out of context. The quoted portion of *Chaplinsky* is in reference to the category of speech known as "fighting words," which by their very nature carry the immediate potential for injury. But "pornography" does not fall within the meaning of "fighting words," as that concept has come to be used. The rationale of *Chaplinsky* is, therefore, distinguishable from the instant case and thus not applicable here.

"(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the purient interest, ...; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." (citations omitted)

413 U.S. at 24, 93 S.Ct. at 2615.

It is obvious that this three-step test is not directly applicable the present case, because, as has been noted, the Ordinance goes beyond legally obscene material in imposing its controls. The restrictions in the Indianapolis ordinance reach what has otherwise traditionally been regarded as protected speech under the *Miller* test. Beyond that, the Ordinance does not speak in terms of a "community standard" or attempt to restrict the dissemination of material that appeals to the "prurient interest." Nor has the Ordinance been drafted in a way to limit only distributions of "patently offensive" materials. Neither does it provide for the dissemination of works which, though "pornographic," may have "serious literary, artistic, political or scientific value." Finally, the Ordinance does not limit its reach to "hard core sexual conduct," though conceivably "hard core" materials may be included in its proscriptions.

Because the Ordinance spans so much more broadly in its regulatory scope than merely "hard core" obscenity by limiting the distribution of "pornography," the proscriptions in the Ordinance intrude with defendants' explicit approval into areas of otherwise protected speech. Under ordinary constitutional analysis, that would be sufficient grounds to overturn the Ordinance, but defendants argue that this case is not governed by any direct precedent, that it raises a new issue for the Court and even though the Ordinance regulates protected speech, it does so in a constitutionally permissible fashion.

C. *Does established First Amendment law permit the regulation provided for in the Ordinance of otherwise protected speech?*

In conceding that the scope of this Ordinance extends beyond constitutional limits, it becomes clear that what defendants actually seek by enacting this legislation is a newly-defined class of constitutionally unprotected speech, labeled "pornography" and characterized as sexually discriminatory.

Defendants vigorously argue that *Miller* is not the " 'constitutional divide' separating protected from unprotected expression in this area." (Defendants' Memorandum In Opposition To Plaintiffs' Motion For Summary Judgment, pp. 27–31). Defendants point to three cases which allegedly support their proposition that *Miller* is not the exclusive guideline for disposing of pornography/obscenity cases, and that the traditional obscenity test should not be applied in the present case. *See New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).

Defendants first argue that the Court must use the same reasoning applied by the Supreme Court in *New York v. Ferber*, *supra*, which upheld a New York statute prohibiting persons from promoting child pornography by distributing material which depicted such activity, and carve out another similar exception to protected speech under the First Amendment.

Defendants can properly claim some support for their position in *Ferber*. There the Supreme Court allowed the states "greater leeway" in their regulation of pornographic depictions of children in light of the State's compelling interest in protecting children who, without such protections, are extraordinarily vulnerable to exploitation and harm. The Court stated in upholding the New York statute:

"The prevention of sexual exploitation and abuse of children constitutes a

government objective of surpassing importance. The legislative findings accompanying passage of the New York laws reflect this concern: ...."

102 S.Ct. at 3355. The Supreme Court continued in *Ferber* by noting that the *Miller* standard for legal obscenity does not satisfy the unique concerns and issues posed by child pornography where children are involved; it is irrelevant, for instance, that the materials sought to be regulated contain serious literary, artistic, political or scientific value. In finding that some speech, such as that represented in depictions of child pornography, is outside First Amendment protections, the *Ferber* court stated:

"When a definable class of material, such as that covered by § 263.15, bears so heavily and pervasively on the welfare of children engaged in its production, we think the balance of competing interests is clearly struck and that it is permissible to consider these materials as without the protection of the First Amendment."

*Id.* at 3358.

Defendants, in the case at bar, argue that the interests of protecting women from sex-based discrimination are analogous to and every bit as compelling and fundamental as those which the Supreme Court upheld in *Ferber* for the benefit of children. But *Ferber* appears clearly distinguishable from the instant case on both the facts and law.

As has already been shown, the rationale applied by the Supreme Court in *Ferber* appears intended to apply solely to child pornography cases. In *Ferber*, the court recognized "that a state's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.' *Globe Newspaper v. Superior Court*, 457 U.S. 596, 607, 102 S.Ct. 2613, 2621, 73 L.Ed.2d 248 (1982)." 102 S.Ct. at 3354. *See also, FCC v. Pacifica Foundation, supra; Prince v. Massachusetts*, 321 U.S. 158, 168, 64 S.Ct. 438, 443, 88 L.Ed. 645 (1944); *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). Also, the obscenity standard in *Miller* is

appropriately abandoned in child pornography cases because it "[does] not reflect the State's particular and more compelling interest in prosecuting those who promote the sexual exploitations of children." *Id.* Since a state's compelling interest in preventing child pornography outweighs an individual's First Amendment rights, the Supreme Court held that "the states are entitled to greater leeway in the regulation of pornographic depictions of children." *Id.* 102 S.Ct. at 3354.

In contrast, the case at bar presents issues more far reaching than those in *Ferber*. Here, the City-County Council found that the distribution, sale, and exhibition of words and pictures depicting the subordination of women is a form of sex discrimination and as such is appropriate for governmental regulation. The state has a well-recognized interest in preventing sex discrimination, and, defendants argue, it can regulate speech to accomplish that end.

 But the First Amendment gives primacy to free speech and any other state interest (such as the interest of sex based equality under law) must be so compelling as to be fundamental; only then can it be deemed to outweigh the interest of free speech. This Court finds no legal authority or public policy argument which justifies so broad an incursion into First Amendment freedoms as to allow that which defendants attempt to advance here. *Ferber* does not open the door to allow the regulation contained in the Ordinance for the reason that adult women as a group do not, as a matter of public policy or applicable law, stand in need of the same type of protection which has long been afforded children. This is true even of women who are subject to the sort of inhuman treatment defendants have described and documented to the Court in support of this Ordinance. The Supreme Court's finding in *Ferber* of the uncontroverted state interest in "safeguarding the physical and psychological well being of a minor" and its resultant characterization of that interest as "compelling," 102 S.Ct. 3348, 3354, is an interest which inheres to children and is not

**1334**

an interest which is readily transferrable to adult women as a class. Adult women generally have the capacity to protect themselves from participating in and being personally victimized by pornography, which makes the State's interest in safeguarding the physical and psychological well-being of women by prohibiting "the sexually explicit subordination of women, graphically depicted, whether in pictures or in words" not so compelling as to sacrifice the guarantees of the First Amendment. In any case, whether a state interest is so compelling as to be a fundamental interest sufficient to warrant an exception from constitutional protections, therefore, surely must turn on something other than mere legislative dictate, which issue is discussed more fully further on in this Opinion. *See* Section "D," *infra.*

The second case relied upon by defendants to support their contention that *Miller* is not controlling in the present case is *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). According to defendants, *Pacifica* exemplifies the Supreme Court's refusal to make obscenity the sole legal basis for regulating sexually explicit conduct.

In *Pacifica,* the Supreme Court was faced with the question of whether a broadcast of patently offensive words dealing with sex and excretion may be regulated on the basis of their content. 438 U.S. at 745, 98 S.Ct. at 3038. The Court held that this type of speech was not entitled to absolute constitutional protection in every context. *Id.* at 747, 98 S.Ct. at 3039. Since the context of the speech in *Pacifica* was broadcasting, it was determined only to be due "the most limited First Amendment protection." *Id.* at 748, 98 S.Ct. at 3040. The reason for such treatment was twofold:

> "First, the broadcast media have established a uniquely pervasive presence in all the lives of all Americans. Patently offensive, indecent material presented over the airwaves confronts the citizen, not only in public, but also in the privacy of the home, where the individual's right

to be left alone plainly outweighs the First Amendment rights of an intruder."
>
> \* \* \* \* \* \*
>
> Second, broadcasting is uniquely accessible to children, even those too young to read ..."

*Id.* at 748–49, 98 S.Ct. at 3040.

Although the defendants correctly point out that the Supreme Court did not use the traditional obscenity test in *Pacifica,* this Court is not persuaded that the rule enunciated there is applicable to the facts of the present case. The Ordinance does not attempt to regulate the airwaves; in terms of its restrictions, it is not even remotely concerned with the broadcast media. The reasons for the rule in *Pacifica,* that speech in certain contexts should be afforded minimal First Amendment protection, are not present here, since we are not dealing with a medium that "invades" the privacy of the home. In contrast, if an individual is offended by "pornography," as defined in the Ordinance, the logical thing to do is avoid it, an option frequently not available to the public with material disseminated through broadcasting.

In addition, the Ordinance is not written to protect children from the distribution of pornography, in contrast to the challenged FCC regulation in *Pacifica.* Therefore, the peculiar state interest in protecting the "well being of its youth," *id.* at 649, 98 S.Ct. at 3040 (quoting *Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)), does not underlie this Ordinance and cannot be called upon to justify a decision by this Court to uphold the Ordinance.

The third case cited by defendants in support of their proposition that the traditional obscenity standard in *Miller* should not be used to overrule the Ordinance is *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). In *Young* the Supreme Court upheld a city ordinance that restricted the location of movie theatres featuring erotic films. The Court, in a plurality opinion, stated that "[e]ven though the First Amendment protects communication in this

area from total suppression, we hold that the State may legitimately use the content of these materials as the basis for placing them in a different classification from other motion pictures." 427 U.S. at 71–72, 96 S.Ct. at 2452. The Court concluded that the city's interest in preserving the character of its neighborhoods justified the ordinance which required that adult theaters be separated, rather than concentrated, in the same areas as it is permissible for other theaters to do without limitation. *Id.* at 71, 96 S.Ct. at 2452–53.

*Young* is distinguishable from the present case because we are not here dealing with an attempt by the City-County Council to restrict the time, place, and manner in which "pornography" may be distributed. Instead, the Ordinance prohibits completely the sale, distribution, or exhibition of material depicting women in a sexually subordinate role, at all times, in all places and in every manner.

The Ordinance's attempt to regulate speech beyond one of the well-defined exceptions to protected speech under the First Amendment is not supported by other Supreme Court precedents. The Court must, therefore, examine the underlying premise of the Ordinance: that the State has so compelling an interest in regulating the sort of sex discrimination imposed and perpetuated through "pornography" that it warrants an exception to free speech.

D. *Is sex discrimination a compelling state interest justifying an exception to First Amendment Protections?*

It is significant to note that the premise of the Ordinance is the sociological harm, *i.e.,* the discrimination, which results from "pornography" to degrade women as a

class. The Ordinance does not presume or require specifically defined, identifiable victims for most of its proscriptions. The Ordinance seeks to protect adult women, as a group, from the diminution of their legal and sociological status as women, that is, from the discriminatory stigma which befalls women *as women* as a result of "pornography." On page one of the introduction to defendants' *Amicus* Brief, counsel explicitly argues that the harm which underlies this legislation is the "harm to the treatment and *status* of women ... on the basis of sex." *See* Brief of Linda Marchiano *Amicus Curiae,* page 1 (emphasis supplied).

This is a novel theory advanced by the defendants, an issue of first impression in the courts. If this Court were to accept defendants' argument—that the State's interest in protecting women from the humiliation and degradation which comes from being depicted in a sexually subordinate context is so compelling as to warrant the regulation of otherwise free speech to accomplish that end—one wonders what would prevent the City-County Council (or any other legislative body) from enacting protections for other equally compelling claims against exploitation and discrimination as are presented here. Legislative bodies, finding support here, could also enact legislation prohibiting other unfair expression—the publication and distribution of racist material, for instance, on the grounds that it causes racial discrimination,[2] or legislation prohibiting ethnic or religious slurs on the grounds that they cause discrimination against particular ethnic or religious groups, or legislation barring literary depictions which are uncompli-

---

**2.** In *Beauharnais v. Illinois,* 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952), the Supreme Court upheld an Illinois libel statute prohibiting the dissemination of materials promoting racial or religious hatred and which tended to produce a breach of the peace and riots. It has been recognized that "the rationale of that decision turns quite plainly on the strong tendency of the prohibited utterances to cause violence and disorder." *Collin v. Smith,* 578 F.2d 1197, 1204 (7th Cir.1978). The Supreme Court has recognized breach of the peace as the traditional

justification for upholding a criminal libel statute. *Beauharnais,* 343 U.S. at 254, 72 S.Ct. at 729. Therefore, a law preventing the distribution of material that causes racial discrimination, an attitude, would be upheld under this analysis. Further, the underlying reasoning of the *Beauharnais* opinion, that the punishment of libel raises no constitutional problems, has been questioned in many recent cases. *See Collin, supra,* 578 F.2d at 1205, and cases cited therein.

mentary or oppressive to handicapped persons on the grounds that they cause discrimination against that group of people, and so on. If this Court were to extend to this case the rationale in *Ferber* to uphold the Amendment, it would signal so great a potential encroachment upon First Amendment freedoms that the precious liberties reposed within those guarantees would not survive. The compelling state interest, which defendants claim gives constitutional life to their Ordinance, though important and valid as that interest may be in other contexts, is not so fundamental an interest as to warrant a broad intrusion into otherwise free expression.

Defendants contend that pornography is not deserving of constitutional protection because its harms victimize all women. It is argued that "pornography" not only negatively affects women who risk and suffer the direct abuse of its production,[3] but also, those on whom violent pornography is forced through such acts as compelled performances of "dangerous acts such as being hoisted upside down by ropes, bound by ropes and chains, hung from trees and scaffolds or having sex with animals...." Defendants' Memorandum In Support To Plaintiffs' Motion For Summary Judgment, pp. 3–4.[4] It is also alleged that exposure to pornography produces a negative impact on its viewers, causing in them an increased willingness to aggress toward women, *ibid.* at p. 4, and experience self-generated rape fantasies, increases in sexual arousal and a rise in the self-reported possibility of raping. *Ibid.* at p. 6. In addition, it causes discriminatory attitudes and behavior toward all women. *Ibid.*, at pp. 11–12. The City-County Council, after considering testimony and social research studies, enacted the Ordinance in order to "combat" pornography's "concrete and tangible harms to women." *Ibid.* at p. 13.

Defendants rely on *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), to justify their regulation of "pornography." In that case the Supreme Court held "that there are legitimate state interests at stake in stemming the tide of commercialized obscenity ... [which] include the interest of the public in the quality of life and the total community environment, the tone of commerce in the great city centers, and, possibly, the public safety itself." 413 U.S. at 57–58, 93 S.Ct. at 2635.

The Georgia Legislature had determined that in that case exposure to obscene material adversely affected men and women, that is to say, society as a whole. Although the petitioners argued in that case that there was no scientific data to conclusively prove that proposition, the Court said, "[i]t is not for us to resolve empirical uncertainties underlying state legislation, save in the exceptional case where that legislation plainly impinges upon rights protected by the constitution itself." *Id.* at 60, 93 S.Ct. at 2636–37 (footnote omitted).

In *Slaton*, the Georgia Legislature sought to regulate "obscenity," an accepted area of unprotected speech. *See Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The Court specifically found that "nothing precludes the State of Georgia from the regulation of the allegedly obscene material exhibited in *Paris Adult Theatre I or II*, provided that the applicable Georgia law, as written or authoritatively interpreted by the Georgia courts, meets the First Amendment standards set forth in *Miller v. California* ..." 413 U.S. at 69, 93 S.Ct. at 2642 (citations omitted).

Based on this reasoning, defendants argue that there is more than enough "empirical" evidence in the case at bar to support the City-County Council's conclusion that

---

3. The defendants point to social research data, as well as graphic personal accounts of individuals, in support of their position that "women are recruited into all forms of sexual exploitation through physical force, psychological coercion, drugs and economic exigencies." Defend-

ants' Memorandum In Support To Plaintiffs' Motion For Summary Judgment, p. 2.

4. Examples of these types of "harms" were submitted to the City-Council at the public hearings held in regard to the Amendment. *See* Exhibits A–U.

"pornography" harms women in the same way obscenity harms people, and, therefore, this Court should not question the legislative finding. As has already been acknowledged, it is not the Court's function to question the City-County Council's legislative finding. The Court's solitary duty is to ensure that the Ordinance accomplishes its purpose without violating constitutional standards or impinging upon constitutionally protected rights. In applying those tests, the Court finds that the Ordinance cannot withstand constitutional scrutiny.

It has already been noted that the Ordinance does not purport to regulate legal obscenity, as defined in *Miller.* Thus, although the City-County Council determined that "pornography" harms women, this Court must and does declare the Ordinance invalid without being bound by the legislative findings because "pornography," as defined and regulated in the Ordinance, is constitutionally protected speech under the First Amendment and such an exception to the First Amendment protections is constitutionally unwarranted.[5] This Court cannot legitimately embark on judicial policy-making, carving out a new exception to the First Amendment simply to uphold the Ordinance, even when there may be many good reasons to support legislative action. To permit every interest group, especially those who claim to be victimized by unfair expression, their own legislative exceptions to the First Amendment so long as they succeed in obtaining a majority of legislative votes in their favor demonstrates the potentially predatory nature of what defendants seek through this Ordinance and defend in this lawsuit.

It ought to be remembered by defendants and all others who would support such a legislative initiative that, in terms of altering sociological patterns, much as alteration may be necessary and desirable, free speech, rather than being the enemy, is a long-tested and worthy ally. To deny free speech in order to engineer social change in the name of accomplishing a greater good for one sector of our society erodes the freedoms of all and, as such, threatens tyranny and injustice for those subjected to the rule of such laws. The First Amendment protections presuppose the evil of such tyranny and prevent a finding by this Court upholding the Ordinance.

### III.

### FIFTH AMENDMENT DUE PROCESS REQUIREMENTS

Assuming *arguendo* that the Court had found that the State has a compelling interest in preventing sex discrimination which interest outweighs First Amendment rights, there remain other constitutional requirements which the Ordinance must satisfy in order to be upheld. The Court must determine if the Ordinance is unconstitutionally vague, if it is facially overbroad, if it constitutes a prior restraint on free speech, or if it violates procedural due process safeguards. The Court, therefore, shall here address each of these issues as if it had found the Ordinance to be properly-regulated speech.

#### A. *Vagueness*

 Plaintiffs contend the Ordinance is unconstitutionally vague, in that it fails to give fair notice of the material intended to be regulated. Plaintiffs challenge a long list of words and phrases on the grounds they are unconstitutionally vague:

"pornography"

"graphic sexually explicit subordination"

"subordination of women"

"sexual objects for domination, conquest, violation, exploitation, possession or use"

---

**5.** Defendants again rely on *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), contending that since the legislation in that case was upheld upon a single affidavit of a sociologist that the location of adult movie theatres had a disruptive impact on the community, the Ordinance should be upheld because there is more than enough data to demonstrate that pornography harms women. As discussed above in subpart B, however, the legislation in *Young* sought to regulate the place where pornography could be distributed, not to completely ban its distribution. Thus *Young* is not controlling.

"postures or positions of servility, submission, or display"

"special display presentations of pornography"

"a woman acting against the subordination of women"

"in the way women are injured by it"

"forcing pornography on a person"

"directly caused by specific pornography"

"the use of men, children or transsexuals in the place of women,"

"unlawful"

"isolated passages or isolated parts"

Plaintiffs also contest on the grounds of vagueness Section 16–28 relating to exhaustion of remedies.

In *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), the Supreme Court stated that a law is void for vagueness if its prohibitions are not clearly defined.

"Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms. Uncertain meanings inevitably lead citizens to "steer far wider of the unlawful zone" ... than if the boundaries of the forbidden areas were clearly marked.' "

408 U.S. at 108–09, 92 S.Ct. at 2298–99 (footnotes omitted).

The Supreme Court in *Keyishian v. Board of Regents*, 385 U.S. 589, 603–4, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629 (1967) has cautioned that:

"precision of regulation must be the touchstone in an area so closely touching our most precious freedoms .... Because First Amendment freedoms need breathing space to survive, government may regulate in this area only with narrow specificity ... when one must guess what conduct or utterance may (lead to governmental action taken against him), one necessarily will 'steer far wider of the unlawful zone.' "

In examining the subject enactments, the Court is struck by the vagueness problems inherent in the definition of pornography, itself, more specifically, the term, "subordination of women." That term is not specifically defined in the Ordinance, and it is almost impossible to settle in ones own mind or experience upon a single meaning or understanding of that term. At the very least, it is difficult to settle upon a meaning which will give persons "of ordinary intelligence a reasonable opportunity to know what is prohibited, so that (they) may act accordingly." *Grayned, supra,* 408 U.S. at 108, 92 S.Ct. at 2298. Nothing in the Ordinance, for instance, suggests whether the forbidden "subordination of women" relates to a physical, social, psychological, religious, or emotional subordination or some other form or combination of these. What constitutes subordination under this Ordinance is left finally to the censorship committee or to individual plaintiffs who choose to bring actions to enforce provisions (of the Ordinance), and under any due process standards, that is unfair in a fundamental and constitutional sense.

The enumerated categories of pornography set out in the Ordinance are also plagued with these same constitutional deficiencies relating to vagueness. For instance, the Ordinance makes it unlawful to depict women, whether in "words or pictures," in "scenarios of degradation, injury, abasement, torture, shown as filthy or inferior, bleeding, bruised, or hurt in a context

that makes these conditions sexual." (Section 16–3(q)(5)). The meanings of the terms, "degradation," "abasement," and "inferior," are subjective terms, reflective of the observer's state of mind. Because these terms arguably have several different meanings, a person of "ordinary intelligence" would not be on notice as to what acts are proscribed by the Ordinance. This vagueness problem is compounded when these terms are joined, definitionally, with the phrase, "in a context that makes these conditions sexual," which is, in itself, also subject to several meanings and which phrase is not further defined in the Ordinance. How then are buyers or sellers of literature, *e.g., The Witches of Eastwick*, by John Updike, to know if their interpretation of the prohibitions in the Ordinance comports with that of the censorship committee or the individuals who seek to privately enforce the Ordinance? The Ordinance clearly threatens to "trap the innocent by not providing fair warning," which makes its provisions impermissibly vague in violation of the Due Process Clause of the Fifth Amendment. *See Grayned, supra,* 408 U.S. at 108–09, 92 S.Ct. at 2298–99.

This is the vagueness which the Fifth Amendment/Due Process rules protect against. Many, if not all of the other words and phrases challenged by plaintiff in this lawsuit on the grounds of vagueness are as difficult, indeed, mystifying as to their precisely-intended meanings, as is "the subordination of women." It is beyond the proper exercise of judicial authority to attempt to re-write the Ordinance to overcome such problems as vagueness, *see Miller v. California,* 413 U.S. at 26, 93 S.Ct. at 2615, and the Court thereby refrains from offering definitions or new language to satisfy constitutional standards.

But the Court finds the Ordinance unconstitutionally vague in its use of particular phrases as well as its more generalized prohibitions. Persons subjected to this Ordinance cannot reasonably steer between lawful and unlawful conduct, with confidence that they know what its terms prohibit.

**B. *Overbreadth***

Plaintiffs also contend that the Ordinance is unconstitutionally overbroad because it restricts the sale, distribution, and exhibition of material protected by the First Amendment. Specifically, plaintiffs allege that the Ordinance regulates non-obscene material and is not limited to the proscription of "hard core" pornography. *See Miller v. California, supra.* Plaintiffs claim that "pornography," as defined in the Ordinance, "contains no 'community standard' test, does not require that the material be 'patently offensive' or 'taken as a whole,' and fails to exempt works that have serious 'literary, artistic, political or scientific value.'" *See* Memorandum Of Law In Support Of Moving Plaintiffs' Motion Pursuant to Fed.R.Civ.P. 56 For Summary Judgment, p. 19.[6]

Because the Court has already determined that the Ordinance on its face violates the First Amendment, it need not belabor its discussion as to overbreadth. The Court specifically found that the Ordinance proscribes protected First Amendment speech. In order to discuss the overbreadth in this context, the Court would have to assume as argument that the Ordinance actually proscribes unprotected speech. Obviously, if it proscribes unprotected speech, it raises no constitutional issues, in particular, issues relating to overbreadth. There being no purpose served by such a discussion and the other related

**6.** Examples of non-obscene films that plaintiffs claim will fall within the meaning of "pornography" are: "Dressed to Kill," "Ten," "Star 80," "Body Heat," "Swept Away," and "Last Tango In Paris." Plaintiffs also contend that the following books would come within the Amendment: *The Witches of Eastwick,* by John Updike, *The Delta of Venus,* Anais Nin, *The Other Side of Midnight,* by Sidney Shelton, *Scruples,* by Judith Krantz, various James Bond novels by Ian Flemming, *The Carpetbaggers,* by Harold Robbins. Amici American Civil Liberties Union and the Indiana Civil Liberties Union have attached a "sampling" of art, literature, and scholarly material they say will be proscribed under the Amendment. *See* Brief of the Amer.Civ.Lib.Union and the Ind.Civ.Lib.Union Amici Curiae, overbreadth appendix.

**1340**

constitutional issues having been otherwise resolved, the Court makes no finding as to overbreadth.

### C. *Prior Restraint*

Plaintiffs contend that the Ordinance is an unconstitutional prior restraint on free speech, in that it allows the City-County government acting through an operating board to prevent the circulation of a book, magazine or movie because some of the citizens disagree with its contents.

The Court finds that one portion of the Ordinance contains a censorship system which does comport with constitutional requirements and that it is, therefore, a lawful prior restraint, but that a second part does not satisfy constitutional requirements and is thus violative of the Constitution. Different administrative procedures apply to the four different types of discriminatory practices enunciated in Section 16–3(g)(4)–(7) of the Ordinance. The procedure specifically applicable to trafficking in pornography, Section 16–3(g)(4), and assault or physical attack due to pornography, Section 16–3(g)(7), satisfies the applicable constitutional requirements and is, therefore, lawful, while the provisions relating to coercion into pornography, Section 16–3(g)(5), and forcing pornography on a person, Section 16–3(g)(6), do not meet the requisite constitutional standards.

A prior restraint is not unlawful *per se. Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, n. 10, 83 S.Ct. 631, 639 n. 10, 9 L.Ed.2d 584 (1963). However, any system of prior restraints bears a heavy presumption against its constitutional validity. *Id.* To be upheld as a lawful prior restraint, defendants must make two showings: (1) that the Ordinance falls within one of the narrowly defined exceptions to the prohibition against prior restraint and (2) that the Ordinance complies with the procedural safeguards that reduce the danger of suppressing speech protected under the First Amendment. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 1247, 43 L.Ed.2d 448; *Bantam Books, supra,* 372 U.S. at 71, 83 S.Ct. at 639.

Obscenity has traditionally been one of the narrowly-defined exceptions to the rule against prior restraints emanating from the First Amendment, *see Freedman v. State of Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), and, since the *Ferber* opinion in 1982, child pornography has also been excepted. Even if we assume that the Ordinance imposes a "permissible" prior restraint as discussed above, it must independently afford procedural due process protections. *Conrad, supra.*

In *Freedman v. Maryland, supra,* the Supreme Court set forth the procedural requirements necessary to insure against the suppression of protected speech. The Court stated that a system of ˉprior restraint

> "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system. First, the burden of proving that the film is unprotected expression must rest on the censor .... Second, while the State may require advance submission of all films, in order to proceed effectively to bar all showings of unprotected films, the requirement cannot be administered in a manner which would lend an effect of finality to the censor's determination whether a film constitutes protected expression .... [Third,] the procedure must also assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license."

380 U.S. at 58–59, 85 S.Ct. at 739. *See Conrad,* 420 U.S. at 560, 95 S.Ct. at 1247.

As mentioned above, the Ordinance provisions relating to coercion and forcing pornography as contained in Section 16–26(d) do not meet the procedural requirements of *Freedman;* thus, such provisions constitute an unlawful prior restraint. The provisions in question allow the governmental committee to make findings and conclusions based upon the evidence presented, and to either sustain or dismiss the complaint. The provisions also give the

Board the authority to issue an order requiring respondent to cease and desist from doing the unlawful discriminatory practice as defined in the Ordinance, as well as the authority to restore to the complainant any losses incurred as a result of the discriminatory practice. Finally, the provisions broadly permit the Board to take any other affirmative action necessary to effectuate the purposes of the Ordinance.

The Committee's findings and conclusions may be appealed; however, the burden of taking the appeal is upon the party against whom the decision has been made. Section 16–26(e). After the decision of the Board is made, whether it is an affirmation or reversal of the Committee's decision, it may be appealed to the state courts by an aggrieved party in accordance with the provisions of the Administrative Adjudication Act. Section 16–26(g). The Act further provides that the burden is upon the aggrieved party to file a verified petition within fifteen (15) days after the Board's determination. I.C. 4–22–1–14(a) and (b).

This procedural scheme is unconstitutional for several reasons. First, if the Board decides in favor of the complainant, it is the responsibility of the respondent, as an aggrieved party, to initiate judicial proceedings to prove that the material is protected. Second, the prior restraint, once imposed, lasts until the pendency of judicial review by the court. Also, the Board, in its discretion, may award to the complainant an amount to compensate for any losses, or any other relief it deems necessary. This process goes far beyond the mere preservation of the status quo. Third, there are no provisions allowing for a "prompt" judicial determination of the Board's decision. *See* I.C. 4–22–1–18 (1984). This type of procedure is expressly prohibited by *Freedman,* and it constitutes an unlawful prior restraint.

Although the provisions just outlined fail to satisfy the procedural requirements, there are other provisions in the ordinance which relate specifically to trafficking in pornography and assault or physical attack due to pornography which do meet the *Freedman* test. The first requirement is met in Section 16–27(e), which provides that the burden of instituting judicial proceedings is upon the censor:

> "whenever the board or committee has found that a respondent has engaged in or is engaging in one of the discriminatory practices set forth in paragraph (g)(4) of Section 16–3, or as against a seller, exhibitor or distributor under paragraph (g)(7) of Section 16–3, the board shall, within ten (10) days after making such finding, file in its own name in the Marion County circuit or superior court an action for declaratory and/or injunctive relief. The board shall have the burden of proving that the actions of the respondent were in violation of this chapter."

Section 16–27(e). The second and third requirements of *Freedman,* that any restraint prior to judicial review be imposed only for a brief period of time to preserve the status quo and that final judicial review be prompt, have also been satisfied:

> "that in any complaint under paragraph (g)(4) of Section 16–3 or against a seller, exhibitor or distributor under paragraph (g)(7) of Section 16–3 no temporary or permanent injunction shall issue prior to a final judicial determination that said activities of respondent do constitute a discriminatory practice under this chapter."

Section 16–27(e). This system of prior restraints is constitutional insofar as the procedural mandates of *Freedman* are concerned. However, even though certain portions of the administrative process outlined by the Ordinance pass constitutional muster, because the *Freedman* procedural due process standard is not satisfied *in toto,* the entire Ordinance fails for imposing an unconstitutional prior restraint on First Amendment expression.

## SUMMARY

For the foregoing reasons, the Court finds that the Ordinance regulates speech protected by the First Amendment and is, therefore, in violation of the United States Constitution. The Ordinance's proscrip-

tions are not limited to categories of speech, such as obscenity or child pornography, which have been excepted from First Amendment protections and permitted some governmental regulation. The City-County Council, in defining and outlawing "pornography" as the graphically depicted subordination of women, which it then characterizes as sex discrimination, has sought to regulate expression, that is, to suppress speech. And although the State has a recognized interest in prohibiting sex discrimination, that interest does not outweigh the constitutionally protected interest of free speech. For these reasons the Ordinance does not withstand this constitutional challenge.