**AMERICAN BOOKSELLERS ASSOCIATION, INC., et al.,**
**Plaintiffs-Appellees,**

v.

**William H. HUDNUT, III, Mayor, City of Indianapolis, et al.,**
**Defendants-Appellants.**

**No. 84–3147.**

United States Court of Appeals,
Seventh Circuit.

Argued June 4, 1985.
Decided Aug. 27, 1985.
Rehearing and Rehearing En Banc
Denied Sept. 20, 1985.

**324**

Mark Dall, City-County Legal Div., Indianapolis, Ind., for defendant-appellant.

Michael A. Bamberger, New York City, for plaintiff-appellee.

Before CUDAHY and EASTERBROOK, Circuit Judges, and SWYGERT, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Indianapolis enacted an ordinance defining "pornography" as a practice that discriminates against women. "Pornography" is to be redressed through the administrative and judicial methods used for other discrimination. The City's definition of "pornography" is considerably different from "obscenity," which the Supreme Court has held is not protected by the First Amendment.

■ To be "obscene" under *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), "a publication must, taken as a whole, appeal to the prurient interest, must contain patently offensive depictions or descriptions of specified sexual conduct, and on the whole have no serious literary, artistic, political, or scientific

value." *Brockett v. Spokane Arcades, Inc.,* —— U.S. ——, 105 S.Ct. 2794, 2800, 86 L.Ed.2d 394 (1985). Offensiveness must be assessed under the standards of the community. Both offensiveness and an appeal to something other than "normal, healthy sexual desires" (*Brockett, supra,* 105 S.Ct. at 2799) are essential elements of "obscenity."

"Pornography" under the ordinance is "the graphic sexually explicit subordination of women, whether in pictures or in words, that also includes one or more of the following:

(1) Women are presented as sexual objects who enjoy pain or humiliation; or

(2) Women are presented as sexual objects who experience sexual pleasure in being raped; or

(3) Women are presented as sexual objects tied up or cut up or mutilated or bruised or physically hurt, or as dismembered or truncated or fragmented or severed into body parts; or

(4) Women are presented as being penetrated by objects or animals; or

(5) Women are presented in scenarios of degradation, injury, abasement, torture, shown as filthy or inferior, bleeding, bruised, or hurt in a context that makes these conditions sexual; or

(6) Women are presented as sexual objects for domination, conquest, violation, exploitation, possession, or use, or through postures or positions of servility or submission or display."

Indianapolis Code § 16–3(q). The statute provides that the "use of men, children, or transsexuals in the place of women in paragraphs (1) through (6) above shall also constitute pornography under this section." The ordinance as passed in April 1984 defined "sexually explicit" to mean actual or simulated intercourse or the uncovered exhibition of the genitals, buttocks or anus. An amendment in June 1984 deleted this provision, leaving the term undefined.

The Indianapolis ordinance does not refer to the prurient interest, to offensiveness, or to the standards of the community. It

demands attention to particular depictions, not to the work judged as a whole. It is irrelevant under the ordinance whether the work has literary, artistic, political, or scientific value. The City and many amici point to these omissions as virtues. They maintain that pornography influences attitudes, and the statute is a way to alter the socialization of men and women rather than to vindicate community standards of offensiveness. And as one of the principal drafters of the ordinance has asserted, "if a woman is subjected, why should it matter that the work has other value?" Catharine A. MacKinnon, *Pornography, Civil Rights, and Speech*, 20 Harv.Civ.Rts.—Civ.Lib.L. Rev. 1, 21 (1985).

Civil rights groups and feminists have entered this case as amici on both sides. Those supporting the ordinance say that it will play an important role in reducing the tendency of men to view women as sexual objects, a tendency that leads to both unacceptable attitudes and discrimination in the workplace and violence away from it. Those opposing the ordinance point out that much radical feminist literature is explicit and depicts women in ways forbidden by the ordinance and that the ordinance would reopen old battles. It is unclear how Indianapolis would treat works from James Joyce's *Ulysses* to Homer's *Iliad;* both depict women as submissive objects for conquest and domination.

We do not try to balance the arguments for and against an ordinance such as this. The ordinance discriminates on the ground of the content of the speech. Speech treating women in the approved way—in sexual encounters "premised on equality" (MacKinnon, *supra,* at 22)—is lawful no matter how sexually explicit. Speech treating women in the disapproved way—as submissive in matters sexual or as enjoying humiliation—is unlawful no matter how significant the literary, artistic, or political qualities of the work taken as a whole. The state may not ordain preferred viewpoints in this way. The Constitution forbids the state to declare one perspective right and silence opponents.

I

The ordinance contains four prohibitions. People may not "traffic" in pornography, "coerce" others into performing in pornographic works, or "force" pornography on anyone. Anyone injured by someone who has seen or read pornography has a right of action against the maker or seller.

Trafficking is defined in § 16–3(g)(4) as the "production, sale, exhibition, or distribution of pornography." The offense excludes exhibition in a public or educational library, but a "special display" in a library may be sex discrimination. Section 16–3(g)(4)(C) provides that the trafficking paragraph "shall not be construed to make isolated passages or isolated parts actionable."

"Coercion into pornographic performance" is defined in § 16–3(g)(5) as "[c]oercing, intimidating or fraudulently inducing any person . . . into performing for pornography. . . ." The ordinance specifies that proof of any of the following "shall not constitute a defense: I. That the person is a woman; . . . VI. That the person has previously posed for sexually explicit pictures . . . with anyone . . .; . . . VIII. That the person actually consented to a use of the performance that is changed into pornography; . . . IX. That the person knew that the purpose of the acts or events in question was to make pornography; . . . XI. That the person signed a contract, or made statements affirming a willingness to cooperate in the production of pornography; XII. That no physical force, threats, or weapons were used in the making of the pornography; or XIII. That the person was paid or otherwise compensated."

"Forcing pornography on a person," according to § 16–3(g)(5), is the "forcing of pornography on any woman, man, child, or transsexual in any place of employment, in education, in a home, or in any public place." The statute does not define forcing, but one of its authors states that the definition reaches pornography shown to medical students as part of their education

or given to language students for translation. MacKinnon, *supra,* at 40–41.

Section 16–3(g)(7) defines as a prohibited practice the "assault, physical attack, or injury of any woman, man, child, or transsexual in a way that is directly caused by specific pornography."

For purposes of all four offenses, it is generally "not ... a defense that the respondent did not know or intend that the materials were pornography...." Section 16–3(g)(8). But the ordinance provides that damages are unavailable in trafficking cases unless the complainant proves "that the respondent knew or had reason to know that the materials were pornography." It is a complete defense to a trafficking case that all of the materials in question were pornography only by virtue of category (6) of the definition of pornography. In cases of assault caused by pornography, those who seek damages from "a seller, exhibitor or distributor" must show that the defendant knew or had reason to know of the material's status as pornography. By implication, those who seek damages from an author need not show this.

A woman aggrieved by trafficking in pornography may file a complaint "as a woman acting against the subordination of women" with the office of equal opportunity. Section 16–17(b). A man, child, or transsexual also may protest trafficking "but must prove injury in the same way that a woman is injured...." *Ibid.* Subsection (a) also provides, however, that "any person claiming to be aggrieved" by trafficking, coercion, forcing, or assault may complain against the "perpetrators." We need not decide whether § 16–17(b) qualifies the right of action in § 16–17(a).

The office investigates and within 30 days makes a recommendation to a panel of the equal opportunity advisory board. The panel then decides whether there is reasonable cause to proceed (§ 16–24(2)) and may refer the dispute to a conciliation conference or to a complaint adjudication committee for a hearing (§§ 16–24(3), 16–26(a)). The committee uses the same procedures ordinarily associated with civil rights litigation. It may make findings and enter orders, including both orders to cease and desist and orders "to take further affirmative action ... including but not limited to the power to restore complainant's losses...." Section 16–26(d). Either party may appeal the committee's decision to the board, which reviews the record before the committee and may modify its decision.

Under Indiana law an administrative decision takes effect when rendered, unless a court issues a stay. Ind.Stat. § 4–22–1–13. The board's decisions are subject to review in the ordinary course. Ind.Stat. § 4–22–1–14. Judicial review in pornography cases is to be de novo, Indianapolis Code § 16–27(e), which provides a second complete hearing. When the board finds that a person has engaged in trafficking or that a seller, exhibitor, or distributor is responsible for an assault, it must initiate judicial review of its own decision, *ibid.,* and the statute prohibits injunctive relief in these cases in advance of the court's final decision. (This is unlike the usual procedure under state law, which permits summary enforcement. Ind.Stat. §§ 4–22–1–18 and 4–22–1–27.)

The district court held the ordinance unconstitutional. 598 F.Supp. 1316 (S.D.Ind. 1984). The court concluded that the ordinance regulates speech rather than the conduct involved in making pornography. The regulation of speech could be justified, the court thought, only by a compelling interest in reducing sex discrimination, an interest Indianapolis had not established. The ordinance is also vague and overbroad, the court believed, and establishes a prior restraint of speech.

## II

The plaintiffs are a congeries of distributors and readers of books, magazines, and films. The American Booksellers Association comprises about 5,200 bookstores and chains. The Association for American Publishers includes most of the country's publishers. Video Shack, Inc., sells and rents video cassettes in Indianapolis. Kelly Bentley, a resident of Indianapolis, reads

books and watches films. There are many more plaintiffs. Collectively the plaintiffs (or their members, whose interests they represent) make, sell, or read just about every kind of material that could be affected by the ordinance, from hard-core films to W.B. Yeats's poem "Leda and the Swan" (from the myth of Zeus in the form of a swan impregnating an apparently subordinate Leda), to the collected works of James Joyce, D.H. Lawrence, and John Cleland.

■ The interests of Bentley and many of the members of the organizational plaintiffs are directly affected by the ordinance, which gives them standing to attack it. *Buckley v. Valeo*, 424 U.S. 1, 11–12 & n. 10, 96 S.Ct. 612, 630–31 & n. 10, 46 L.Ed.2d 659 (1976). There is no need to invoke the special standing rules applicable to overbroad laws that affect speech, see *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); Henry P. Monaghan, *Overbreadth*, 1981 Sup. Ct.Rev. 1.

■ The district court prevented the ordinance from taking effect. The expedition with which this suit was filed raises questions of ripeness and abstention. Ripeness is a prudential question, see *Buckley, supra,* 424 U.S. at 13–18, 96 S.Ct. at 631–34; *Thomas v. Union Carbide Agricultural Products Co.,* —— U.S. ——, 105 S.Ct. 3325, 3332–34, 87 L.Ed.2d 409 (1985). A case is not ripe if the issues are still poorly formed or the application of the statute is uncertain. A challenge may be ripe, however, even when the statute is not yet effective. *Entertainment Concepts, Inc. v. Maciejewski,* 631 F.2d 497, 500 (7th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981). The statute challenged in *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), had an effective date two years in the future, yet the Court found the suit ripe. Here, as in *Pierce,* the dispute may be resolved without reference to the administration of the statute. We gain nothing by waiting. Time would take a toll, however, on the speech of the parties

subject to the act. They must take special care not to release material that might be deemed pornographic, for that material could lead to awards of damages. Deferred adjudication would produce tempered speech without assisting in resolution of the controversy.

It is also inappropriate to abstain under *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Abstention is appropriate when state courts may clarify the meaning of a statute, thus sharpening the constitutional dispute and perhaps preventing an unnecessary constitutional adjudication. This statute, however, is all too clear. Cf. *Mazanec v. North Judson—San Pierre School Corp.,* 763 F.2d 845, 848 (7th Cir. 1985). A state court could not construe this ordinance as an "ordinary" obscenity law; another law serves that function. Ind.Stat. § 35–49–1–1 et seq. It is designed to be distinctively different, to prohibit explicitly sexual speech that "subordinates" women in specified ways. If abstention was unnecessary in *Brockett,* despite the argument (which convinced the Chief Justice and Justices Rehnquist and O'Connor, see 105 S.Ct. at 2804–05) that a state court could save the statute by excising or construing a single element of the definition of obscenity, it surely is unnecessary here, for it is the structure of the statute rather than the meaning of any one of its terms that leads to the constitutional problem.

### III

■ "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943). Under the First Amendment the government must leave to the people the evaluation of ideas. Bald or subtle, an idea is as powerful as the audience allows it to

be. A belief may be pernicious—the beliefs of Nazis led to the death of millions, those of the Klan to the repression of millions. A pernicious belief may prevail. Totalitarian governments today rule much of the planet, practicing suppression of billions and spreading dogma that may enslave others. One of the things that separates our society from theirs is our absolute right to propagate opinions that the government finds wrong or even hateful.

The ideas of the Klan may be propagated. *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Communists may speak freely and run for office. *DeJonge v. Oregon*, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937). The Nazi Party may march through a city with a large Jewish population. *Collin v. Smith*, 578 F.2d 1197 (7th Cir.), *cert. denied*, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978). People may criticize the President by misrepresenting his positions, and they have a right to post their misrepresentations on public property. *Lebron v. Washington Metropolitan Area Transit Authority*, 749 F.2d 893 (D.C.Cir.1984) (Bork, J.). People may teach religions that others despise. People may seek to repeal laws guaranteeing equal opportunity in employment or to revoke the constitutional amendments granting the vote to blacks and women. They may do this because "above all else, the First Amendment means that government has no power to restrict expression because of its message [or] its ideas...." *Police Department v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). See also Geoffrey R. Stone, *Content Regulation and the First Amendment*, 25 William & Mary L.Rev. 189 (1983); Paul B. Stephan, *The First Amendment and Content Discrimination*, 68 Va.L.Rev. 203, 233–36 (1982).

Under the ordinance graphic sexually explicit speech is "pornography" or not depending on the perspective the author adopts. Speech that "subordinates" women and also, for example, presents women as enjoying pain, humiliation, or rape, or even simply presents women in "positions of servility or submission or display" is forbidden, no matter how great the literary or political value of the work taken as a whole. Speech that portrays women in positions of equality is lawful, no matter how graphic the sexual content. This is thought control. It establishes an "approved" view of women, of how they may react to sexual encounters, of how the sexes may relate to each other. Those who espouse the approved view may use sexual images; those who do not, may not.

Indianapolis justifies the ordinance on the ground that pornography affects thoughts. Men who see women depicted as subordinate are more likely to treat them so. Pornography is an aspect of dominance.[1] It does not persuade people so much as change them. It works by socializing, by establishing the expected and the permissible. In this view pornography is not an idea; pornography is the injury.

There is much to this perspective. Beliefs are also facts. People often act in

---

**1.** "Pornography constructs what a woman is in terms of its view of what men want sexually.... Pornography's world of equality is a harmonious and balanced place. Men and women are perfectly complementary and perfectly bipolar.... All the ways men love to take and violate women, women love to be taken and violated.... What pornography *does* goes beyond its content: It eroticizes hierarchy, it sexualizes inequality. It makes dominance and submission sex. Inequality is its central dynamic; the illusion of freedom coming together with the reality of force is central to its working.... [P]orgraphy is neither harmless fantasy nor a corrupt and confused misrepresentation of an otherwise neutral and healthy sexual situation. It institutionalizes the sexuality of male supremacy, fusing the erotization of dominance and submission with the social construction of male and female.... Men treat women as who they see women as being. Pornography constructs who that is. Men's power over women means that the way men see women defines who women can be. Pornography ... is a sexual reality." MacKinnon, *supra*, at 17–18 (note omitted, emphasis in original). See also Andrea Dworkin, *Pornography: Men Possessing Women* (1981). A national commission in Canada recently adopted a similar rationale for controlling pornography. Special Commission on Pornography and Prostitution, 1 *Pornography and Prostitution in Canada* 49–59 (Canadian Government Publishing Centre 1985).

accordance with the images and patterns they find around them. People raised in a religion tend to accept the tenets of that religion, often without independent examination. People taught from birth that black people are fit only for slavery rarely rebelled against that creed; beliefs coupled with the self-interest of the masters established a social structure that inflicted great harm while enduring for centuries. Words and images act at the level of the subconscious before they persuade at the level of the conscious. Even the truth has little chance unless a statement fits within the framework of beliefs that may never have been subjected to rational study.

Therefore we accept the premises of this legislation. Depictions of subordination tend to perpetuate subordination. The subordinate status of women in turn leads to affront and lower pay at work, insult and injury at home, battery and rape on the streets.[2] In the language of the legislature, "[p]ornography is central in creating and maintaining sex as a basis of discrimination. Pornography is a systematic practice of exploitation and subordination based on sex which differentially harms women. The bigotry and contempt it produces, with the acts of aggression it fosters, harm women's opportunities for equality and rights [of all kinds]." Indianapolis Code § 16-1(a)(2).

Yet this simply demonstrates the power of pornography as speech. All of these unhappy effects depend on mental intermediation. Pornography affects how people see the world, their fellows, and social relations. If pornography is what pornography does, so is other speech. Hitler's orations affected how some Germans saw Jews. Communism is a world view, not simply a *Manifesto* by Marx and Engels or a set of speeches. Efforts to suppress communist speech in the United States were based on the belief that the public acceptability of such ideas would increase the likelihood of totalitarian government. Religions affect socialization in the most pervasive way. The opinion in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), shows how a religion can dominate an entire approach to life, governing much more than the relation between the sexes. Many people believe that the existence of television, apart from the content of specific programs, leads to intellectual laziness, to a penchant for violence, to many other ills. The Alien and Sedition Acts passed during the administration of John Adams rested on a sincerely held belief that disrespect for the government leads to social collapse and revolution—a belief with support in the history of many nations. Most governments of the world act on this empirical regularity, suppressing critical speech. In the United States, however, the strength of the support for this belief is irrelevant. Seditious libel is protected speech unless the danger is not only grave but also imminent. See *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); cf. *Brandenburg v. Ohio, supra; New York*

**2.** MacKinnon's article collects empirical work that supports this proposition. The social science studies are very difficult to interpret, however, and they conflict. Because much of the effect of speech comes through a process of socialization, it is difficult to measure incremental benefits and injuries caused by particular speech. Several psychologists have found, for example, that those who see violent, sexually explicit films tend to have more violent thoughts. But how often does this lead to actual violence? National commissions on obscenity here, in the United Kingdom, and in Canada have found that it is not possible to demonstrate a direct link between obscenity and rape or exhibitionism. The several opinions in *Miller v. California* discuss the U.S. commission. See also *Report of the Committee on Obscenity and Film Censorship* 61–95 (Home Office, Her Majesty's Stationery Office, 1979); Special Committee on Pornography and Prostitution, 1 *Pornography and Prostitution in Canada* 71–73, 95–103 (Canadian Government Publishing Centre 1985). In saying that we accept the finding that pornography as the ordinance defines it leads to unhappy consequences, we mean only that there is evidence to this effect, that this evidence is consistent with much human experience, and that as judges we must accept the legislative resolution of such disputed empirical questions. See *Gregg v. Georgia*, 428 U.S. 153, 184–87, 96 S.Ct. 2909, 2930–31, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

*Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

Racial bigotry, anti-semitism, violence on television, reporters' biases—these and many more influence the culture and shape our socialization. None is directly answerable by more speech, unless that speech too finds its place in the popular culture. Yet all is protected as speech, however insidious. Any other answer leaves the government in control of all of the institutions of culture, the great censor and director of which thoughts are good for us.

Sexual responses often are unthinking responses, and the association of sexual arousal with the subordination of women therefore may have a substantial effect. But almost all cultural stimuli provoke unconscious responses. Religious ceremonies condition their participants. Teachers convey messages by selecting what not to cover; the implicit message about what is off limits or unthinkable may be more powerful than the messages for which they present rational argument. Television scripts contain unarticulated assumptions. People may be conditioned in subtle ways. If the fact that speech plays a role in a process of conditioning were enough to permit governmental regulation, that would be the end of freedom of speech.

It is possible to interpret the claim that the pornography is the harm in a different way. Indianapolis emphasizes the injury that models in pornographic films and pictures may suffer. The record contains materials depicting sexual torture, penetration of women by red-hot irons and the like. These concerns have nothing to do with written materials subject to the statute, and physical injury can occur with or without the "subordination" of women. As we discuss in Part IV, a state may make injury in the course of producing a film unlawful independent of the viewpoint expressed in the film.

The more immediate point, however, is that the image of pain is not necessarily pain. In *Body Double,* a suspense film directed by Brian DePalma, a woman who has disrobed and presented a sexually ex-

plicit display is murdered by an intruder with a drill. The drill runs through the woman's body. The film is sexually explicit and a murder occurs—yet no one believes that the actress suffered pain or died. In *Barbarella* a character played by Jane Fonda is at times displayed in sexually explicit ways and at times shown "bleeding, bruised, [and] hurt in a context that makes these conditions sexual"—and again no one believes that Fonda was actually tortured to make the film. In *Carnal Knowledge* a woman grovels to please the sexual whims of a character played by Jack Nicholson; no one believes that there was a real sexual submission, and the Supreme Court held the film protected by the First Amendment. *Jenkins v. Georgia,* 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974). And this works both ways. The description of women's sexual domination of men in *Lysistrata* was not real dominance. Depictions may affect slavery, war, or sexual roles, but a book about slavery is not itself slavery, or a book about death by poison a murder.

Much of Indianapolis's argument rests on the belief that when speech is "unanswerable," and the metaphor that there is a "marketplace of ideas" does not apply, the First Amendment does not apply either. The metaphor is honored; Milton's *Aeropagitica* and John Stewart Mill's *On Liberty* defend freedom of speech on the ground that the truth will prevail, and many of the most important cases under the First Amendment recite this position. The Framers undoubtedly believed it. As a general matter it is true. But the Constitution does not make the dominance of truth a necessary condition of freedom of speech. To say that it does would be to confuse an outcome of free speech with a necessary condition for the application of the amendment.

A power to limit speech on the ground that truth has not yet prevailed and is not likely to prevail implies the power to declare truth. At some point the government must be able to say (as Indianapolis has said): "We know what the truth is, yet a

free exchange of speech has not driven out falsity, so that we must now prohibit falsity." If the government may declare the truth, why wait for the failure of speech? Under the First Amendment, however, there is no such thing as a false idea, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339, 94 S.Ct. 2997, 3006, 41 L.Ed.2d 789 (1974), so the government may not restrict speech on the ground that in a free exchange truth is not yet dominant.

At any time, some speech is ahead in the game; the more numerous speakers prevail. Supporters of minority candidates may be forever "excluded" from the political process because their candidates never win, because few people believe their positions. This does not mean that freedom of speech has failed.

The Supreme Court has rejected the position that speech must be "effectively answerable" to be protected by the Constitution. For example, in *Buckley v. Valeo*, *supra*, 424 U.S. at 39–54, 96 S.Ct. at 644–51, the Court held unconstitutional limitations on expenditures that were neutral with regard to the speakers' opinions and designed to make it easier for one person to answer another's speech. See also *FEC v. National Conservative PAC*, —— U.S. ——, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). In *Mills v. Alabama*, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966), the Court held unconstitutional a statute prohibiting editorials on election day—a statute the state had designed to prevent speech that came too late for answer. In cases from *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), through *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), the Court has held that the First Amendment protects political stratagems— obtaining legislation through underhanded ploys and outright fraud in *Noerr*, obtaining political and economic ends through boycotts in *Clairborne Hardware*—that may be beyond effective correction through more speech.

We come, finally, to the argument that pornography is "low value" speech, that it is enough like obscenity that Indianapolis may prohibit it. Some cases hold that speech far removed from politics and other subjects at the core of the Framers' concerns may be subjected to special regulation. E.g., *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 67–70, 96 S.Ct. 2440, 2450–52, 49 L.Ed.2d 310 (1976) (plurality opinion); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 768–69, 86 L.Ed. 1031 (1942). These cases do not sustain statutes that select among viewpoints, however. In *Pacifica* the FCC sought to keep vile language off the air during certain times. The Court held that it may; but the Court would not have sustained a regulation prohibiting scatological descriptions of Republicans but not scatological descriptions of Democrats, or any other form of selection among viewpoints. See *Planned Parenthood Ass'n v. Chicago Transit Authority*, 767 F.2d 1225, 1232–33 (7th Cir.1985).

At all events, "pornography" is not low value speech within the meaning of these cases. Indianapolis seeks to prohibit certain speech because it believes this speech influences social relations and politics on a grand scale, that it controls attitudes at home and in the legislature. This precludes a characterization of the speech as low value. True, pornography and obscenity have sex in common. But Indianapolis left out of its definition any reference to literary, artistic, political, or scientific value. The ordinance applies to graphic sexually explicit subordination in works great and small.[3] The Court sometimes balances

---

**3.** Indianapolis briefly argues that *Beauharnais v. Illinois*, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952), which allowed a state to penalize "group libel," supports the ordinance. In *Collin v. Smith, supra*, 578 F.2d at 1205, we concluded that cases such as *New York Times v. Sullivan* had so washed away the foundations of *Beauharnais* that it could not be considered authoritative. If we are wrong in this, however, the case still does not support the ordinance. It is not clear that depicting women as subordinate in sexually explicit ways, even combined with a

the value of speech against the costs of its restriction, but it does this by category of speech and not by the content of particular works. See John Hart Ely, *Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis*, 88 Harv.L.Rev. 1482 (1975); Geoffrey R. Stone, *Restrictions of Speech Because of its Content: The Strange Case of Subject-Matter Restrictions*, 46 U.Chi.L.Rev. 81 (1978). Indianapolis has created an approved point of view and so loses the support of these cases.

Any rationale we could imagine in support of this ordinance could not be limited to sex discrimination. Free speech has been on balance an ally of those seeking change. Governments that want stasis start by restricting speech. Culture is a powerful force of continuity; Indianapolis paints pornography as part of the culture of power. Change in any complex system ultimately depends on the ability of outsiders to challenge accepted views and the reigning institutions. Without a strong guarantee of freedom of speech, there is no effective right to challenge what is.

### IV

The definition of "pornography" is unconstitutional. No construction or excision of particular terms could save it. The offense of trafficking in pornography necessarily falls with the definition. We express no view on the district court's conclusions that the ordinance is vague and that it establishes a prior restraint. Neither is necessary to our judgment. We also express no view on the argument presented by several amici that the ordinance is itself a form of discrimination on account of sex.

Section 8 of the ordinance is a strong severability clause, and Indianapolis asks that we parse the ordinance to save what we can. If a court could do this by surgical excision, this might be possible. *Zbaraz v. Hartigan*, 763 F.2d 1532, 1545 (7th Cir.1985). But a federal court may not completely reconstruct a local ordinance, and we conclude that nothing short of rewriting could save anything.

The offense of coercion to engage in a pornographic performance, for example, has elements that might be constitutional. Without question a state may prohibit fraud, trickery, or the use of force to induce people to perform—in pornographic films or in any other films. Such a statute may be written without regard to the viewpoint depicted in the work. *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), suggests that when a state has a strong interest in forbidding the conduct that makes up a film (in *Ferber* sexual acts involving minors), it may restrict or forbid dissemination of the film in order to reinforce the prohibition of the conduct. A state may apply such a rule to non-sexual coercion (although it need not). We suppose that if someone forced a prominent political figure, at gunpoint, to endorse a candidate for office, a state could forbid the commercial sale of the film containing that coerced endorsement. The same principle allows a court to enjoin the publication of stolen trade secrets and award damages for the publication of copyrighted matter without permission. See *Harper & Row, Publishers, Inc. v. Nation Enterprises*, —— U.S. ——, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Cf. *Snepp v. United States*, 444 U.S. 507, 509 & n. 3, 100 S.Ct. 763, 765 & n. 3, 62 L.Ed.2d 704 (1980).

But the Indianapolis ordinance, unlike our hypothetical statute, is not neutral with respect to viewpoint. The ban on distribution of works containing coerced performances is limited to pornography; coercion is irrelevant if the work is not "pornography," and we have held the definition of "pornography" to be defective root and branch. A legislature might replace "por-

---

depiction of pleasure in rape, would fit within the definition of a group libel. The well received film *Swept Away* used explicit sex, plus taking pleasure in rape, to make a political statement, not to defame. Work must be an

insult or slur for its own sake to come within the ambit of *Beauharnais*, and a work need not be scurrilous at all to be "pornography" under the ordinance.

nography" in § 16–3(g)(4) with "any film containing explicit sex" or some similar expression, but even the broadest severability clause does not permit a federal court to rewrite as opposed to excise. Rewriting is work for the legislature of Indianapolis. Cf. *Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975); *Califano v. Westcott,* 443 U.S. 76, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979).

The offense of forcing pornography on unwilling recipients is harder to assess. Many kinds of forcing (such as giving texts to students for translation) may themselves be protected speech. *Rowan v. Post Office,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), shows that a state may permit people to insulate themselves from categories of speech—in *Rowan* sexual mail—but that the government must leave the decision about what items are forbidden in the hands of the potentially offended recipients. See *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (the government may not define for itself a category of constitutionally protected but sexual speech that may not be mailed). Exposure to sex is not something the government may prevent, see *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). We therefore could not save the offense of "forcing" by redefining "pornography" as all sexually-offensive speech or some related category. The statute needs a definition of "forcing" that removes the government from the role of censor. See also *Planned Parenthood Ass'n, supra,* holding that the "captive audience" problem does not permit a government to discriminate on account of the speaker's message.

The section creating remedies for injuries and assaults attributable to pornography also is salvageable in principle, although not by us. The First Amendment does not prohibit redress of all injuries caused by speech. Injury to reputation is

redressed through the law of libel, which is constitutional subject to strict limitations. Cases such as *Brandenburg v. Ohio* and *NAACP v. Claiborne Hardware* hold that a state may not penalize speech that does not cause immediate injury. But we do not doubt that if, immediately after the Klan's rally in *Brandenburg,* a mob had burned to the ground the house of a nearby black person, that person could have recovered damages from the speaker who whipped the crowd into a frenzy. All of the Justices assumed in *Claiborne Hardware* that if the threats in Charles Evers's incendiary speech had been a little less veiled and had led directly to an assault against a person shopping in a store owned by a white merchant, the victim of the assault and even the merchant could have recovered damages from the speaker.

The law of libel has the potential to muzzle the press, which led to *New York Times v. Sullivan.* See also *Ollman v. Evans,* 750 F.2d 970, 994–98 (D.C.Cir.1984) (en banc) (Bork, J., concurring). A law awarding damages for assaults caused by speech also has the power to muzzle the press, and again courts would place careful limits on the scope of the right. Certainly no damages could be awarded unless the harm flowed directly from the speech and there was an element of intent on the part of the speaker, as in *Sullivan* and *Brandenburg.*

Much speech is dangerous. Chemists whose work might help someone build a bomb, political theorists whose papers might start political movements that lead to riots, speakers whose ideas attract violent protesters, all these and more leave loss in their wake. Unless the remedy is very closely confined, it could be more dangerous to speech than all the libel judgments in history. The constitutional requirements for a valid recovery for assault caused by speech might turn out to be too rigorous for any plaintiff to meet.[4] But the Indianapolis ordinance requires the complainant to show that the attack was

---

**4.** See, e.g., *Zamora v. CBS,* 480 F.Supp. 199 (S.D.Fla.1979), among the many cases concluding that particular plaintiffs could not show a

connection sufficiently direct to permit liability consistent with the First Amendment.

"directly caused by specific pornography" (§ 16–3(g)(7) ), and it is not beyond the realm of possibility that a state court could construe this limitation in a way that would make the statute constitutional. We are not authorized to prevent the state from trying.

Again, however, the assault statute is tied to "pornography," and we cannot find a sensible way to repair the defect without seizing power that belongs elsewhere. Indianapolis might choose to have no ordinance if it cannot be limited to viewpoint-specific harms, or it might choose to extend the scope to all speech, just as the law of libel applies to all speech. An attempt to repair this ordinance would be nothing but a blind guess.

No amount of struggle with particular words and phrases in this ordinance can leave anything in effect. The district court came to the same conclusion. Its judgment is therefore

AFFIRMED.

SWYGERT, Senior Circuit Judge, concurring.

I concur in Parts I, II, and III of the court's opinion except for the following strictures. Although raised in the district court, neither ripeness nor abstention was made an issue on appeal. Given that fact, I believe both are pseudo-issues and this court need not treat them *sua sponte*. True, some of the intervenors have discussed abstention in their briefs; but we are without the benefit of the views of the real parties at interest in this case on either issue. More importantly, a discussion and resolution of these issues are quite unnecessary to the disposition of this appeal.

I also believe that the majority's questionable and broad assertions regarding how human behavior can be conditioned by certain teachings and beliefs (*see ante* at 328–29, 330) are unnecessary. For even if this court accepts the City of Indianapolis' basic contention that pornography does condition unfavorable responses to women, the ordinance is still unconstitutional.

As to Part IV of the opinion, I agree that the ordinance is unconstitutional on first amendment grounds and that there is no need to discuss vagueness or prior restraint. I do, however, disassociate myself from the extensive statements with respect to how the Indianapolis City Council could fashion an ordinance dealing with pornography that might pass constitutional muster. Indianapolis has asked us to sever the ordinance and save those parts that are not unconstitutional, if we can. All then that this court is required to do is to rule that the ordinance is not severable. Statements regarding which portions of the ordinance may be constitutional are merely advisory and are not the function of this court.